SUCKOW BORAX MINES CONSOLIDATED, Inc., et al. v. BORAX CONSOLIDATED, LIMITED, et al.

No. 12158.

United States Court of Appeals Ninth Circuit.

Oct. 26, 1950.

Therman Arnold, Washington, D. C., Frank Buren, Los Angeles, Cal., and Sterling Carr, San Francisco, Cal., for appellants.

Maurice E. Harrison, Moses Lasky and Brobeck, Phleger & Harrison, all of San Francisco, Cal., Ray J. Coleman and Coleman & McDonald, all of Los Angeles, Cal., for appellees Borax Consolidated et al.

Maurice E. Harrison, Moses Lasky, and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for appellee Bank of America.

Vincent H. O'Donnell, San Francisco, Cal., for appellee Stauffer Chemical Co.

John L. Reith, Oakland, Cal., for appellee West End Chemical Co.

Joseph W. Burns, Fulton, Walter & Halley, Michael F. McCarthy and Oliver & Donnally, all of New York City, Charles A. Beardsley, Oakland, Cal., for appellee American Potash & Chemical Corp.

Before HEALY, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

This action was commenced by the four appellants [1] on September 11, 1947. It is a suit for treble damages brought under the antitrust laws of the United States, 15 U.S.C.A. § 15, involves the borax industry, and is based on the claim that appellees [2] conspired together and drove appellants out of business by wrongful and illegal acts, all of which damaged appellants in the sum of $5,000,000. The prayer of the complaint is for a recovery of three times this amount. The case is here on appeal from the order of the trial court dismissing appellants' second amended complaint and from the denial of a motion to amend the said order so as to permit the filing of a third amended complaint. [3]

1. Appellants (plaintiffs below) are Suckow Borax Mines Consolidated, Inc., a Delaware corporation (hereinafter referred to as Suckow Co.); Mojave Borax Co., Ltd., a Nevada corporation (hereinafter referred to as Mojave); Paul O. Toebler, executor of the estate of John K. Suckow, deceased and Ruth E. Suckow who is the widow of John K. Suckow.

2. Appellees are Borax Consolidated Ltd. (hereinafter referred to as Borax Ltd.), a British corporation; Pacific Coast Borax Company (hereinafter referred to as Pacific Coast), a Nevada corporation owned by Borax Ltd.; United States Borax Company (hereinafter referred to as U. S. Borax), a West Virginia corporation owned by Borax Ltd.; American Potash and Chemical Corporation (here-inafter referred to as American Potash), a Delaware corporation; Stauffer Chemical Company (hereinafter referred to as Stauffer Co.), a California corporation; West End Chemical Company (hereinafter referred to as West End Co.); James M. Gerstley; Frank M. Jenifer and Bank of America National Trust and Savings Association as executor of the estate of Clarence M. Rasor (all of the individual defendants being officers or agents of the corporate defendants or some of them). Other corporate and individual defendants were named in the complaint but six were never served and two were dismissed for lack of venue.

3. The opinion of the trial court is reported in 81 F.Supp. 301. Reference to Burnham Chemical Co. v. Borax Consolidated

## The Complaint

The complaint (in 95 lengthy paragraphs, which occupy 77 pages of the appeal record) recites a history of the development of the borax industry, and charges that since 1929, and many years prior thereto and continuing up until approximately 1945, the defendants conspired to, and did, monopolize and control the mining, production, processing, manufacture, distribution, trade and sale of the world's supply of crude borates, refined borax, and boric acid. This monopoly, it is charged, was achieved by a combination and conspiracy to restrain trade and commerce in violation of the antitrust laws, and pursuant to the terms of a continuing conspiracy (which appellants call the "General Conspiracy") which resulted from an agreement entered into on November 27, 1929 between appellees.

We here endeavor to summarize the essential and controlling averments of this long complaint.

Under this 1929 agreement appellees became members of a conspiracy having for its purpose the creation and perpetuation of a monopoly of the entire borax industry. This was to be accomplished by purchase or lease of approximately 95% of the world's known deposits of borate minerals (including 100% of the known sodium borate deposits—sodium borates are found in purer form than other borate minerals, and hence are more economical to refine) and approximately 90% of the world's known lake brines from which borax may be extracted; by allocation of production and refining of borax; by allocation of markets, trade areas and classes of consumers; by agreements to fix arbitrary and noncompetitive prices, resale prices, freights, discounts, permitted use, and conditions of sale of crude borates, refind borax and boric acid; by blacklisting consumers who dealt with other producers, and by the elimination and destruction, through purchase or otherwise, of all competitors of the defendants, including John K. Suckow and his interests, plaintiffs herein.

It is charged that this 1929 "agreement" was renewable annually; that it was subsequently extended and modified, and as modified, remained in effect until some time in 1944. The remainder of the complaint is concerned with a history of the various and devious methods and plans employed by defendants to bring John Suckow to his knees and it portrays a series of oppressive and coercive acts directed against appellants.

John Suckow, a medical practitioner, fortuitously discovered a vein of borate ore in 1912 while drilling for water upon his farm in the Mojave desert in California. Shortly thereafter Suckow, not knowing its true worth, sold his interest in a portion of the land to agents of U. S. Borax for a nominal sum. In ensuing years Suckow attempted to develop the borate deposits on the remaining portion of the land owned by him, and on another section of land upon which he had meanwhile filed patents. These development attempts were opposed by various of appellees herein by means of claim-jumping, forced sales, employment of undisclosed agents, and other tactics. In 1926 Suckow discovered a rich and deep deposit of sodium borate ore on a section of land then owned jointly by Suckow and Pacific Coast. (It is alleged that Pacific Coast had no rightful interest in this land.) From that time on he was harassed by a series of law suits and foundless claims brought by Borax Ltd. and its subsidiaries and agents.

In 1929 Suckow formed the Suckow Co. and transferred all of his borax interests to said corporation. During that same year he succeeded in negotiating a contract with Gembo, a Dutch corporation, for the marketing and sale of borax mined and processed by Suckow Co. When defend-

Ltd., 9 Cir., 170 F.2d 569, certiorari denied 336 U.S. 924, 69 S.Ct. 655, 93 L. Ed. 1086, rehearing denied 336 U.S. 955, 69 S.Ct. 878, 93 L.Ed. 1109, may be helpful, for in many respects the charges in the complaint and the legal and procedural issues in that case closely parallel those in the instant case. The conspiracy referred to in the Burnham case is the same one upon which this action was brought and most of the defendants in this case were defendants there.

ants learned that despite their carefully drawn schemes for controlling the markets Suckow had found an outlet for his products they renewed their efforts to force him to sell out or to terminate his operations. In an equity action for an accounting Borax, Ltd. persuaded the court (in 1932) that the value of the ore was $21.89 per ton. Suckow was compelled to pay to Borax Ltd. one-half of that amount for every ton of ore removed; this forced him to cease operations (in or about 1933). In a bankruptcy proceeding brought at approximately the same time agents and attorneys of Borax Ltd. succeeded in convincing the bankruptcy court that the value of Suckow's ore was only $2.50 per ton.

Various other suits were filed by some of the appellees. On March 2, 1933, Suckow Co. was adjudged a bankrupt but only after Borax Ltd. or its agents had, by the use of false testimony and fictitious claims, caused the bankruptcy referee to scale down the value of the assets of Suckow Co. to a fraction of their true value and build up the amount of its liabilities by including nonexistent claims (one of which was a purported claim of Dr. Suckow himself for $76,922 which he insisted was not owed and never had been owed to him by the Suckow Co.).

On April 17, 1934, the trustee in bankruptcy leased the interest of the Suckow Co. in the calcining plant to Pacific Coast for a period of five years.

On August 18, 1934 three different proceedings or orders, which had been brought or instigated by defendants, were pending against Suckow or Suckow Co. in the trial court, and five which had been decided adversely to him were pending on appeal. On that date Suckow and his wife Ruth entered into a settlement agreement with Pacific Coast wherein it was agreed that the Suckows and/or Suckow Co. would convey certain property to Pacific Coast, would execute, together with the trustee, a more favorable lease of the mine to Pacific Coast (for a ten year period) and would dismiss all of the appeals and release all possible claims against Pacific Coast Borax Ltd., and U. S. Borax. In return Pacific Coast agreed to dismiss certain actions against Suckow and Suckow Co., file satisfactions of certain judgments, execute or obtain certain releases, and pay Suckow the sum of $150,000. The conditions of this settlement agreement of August 18, 1934 were fulfilled by all parties.

It is alleged that Suckow would not have entered into the said settlement agreement but for his desperate financial condition which had been caused by defendants' schemes and activities and but for his complete ignorance of the existence of the illegal "General Conspiracy."

In 1938 the royalties from the lease had paid off all of the bankruptcy creditors and the expenses of administration. In consequence the bankruptcy proceedings of Suckow Co. were terminated and the property in the hands of the trustee was returned to the Suckow Co. This consisted primarily of an undivided one-half interest in the reversion of the mine property, and in a right to royalties upon one-half of the ore extracted by the lessee, Pacific Coast.

In December of 1942 Suckow Co. entered into an agreement with Pacific Coast whereby the Suckow Co., for the sum of $350,000 in cash, sold to Pacific Coast all of its interest in the borax property, real and personal, and released Pacific Coast and Borax Ltd. from all claims, demands, and causes of action.

It is alleged that the officers of the Suckow Co. entered into this 1942 agreement and sale only because they were discouraged by the continued harassment by defendants. Specifically, lessee Pacific Coast had substantially impaired future mining and production of ore by inefficient and unminer-like methods of mining and by causing, through negligence or design, cave-ins which blocked access to productive areas of the mine, threatened to totally exhaust the ore and refuse to deliver possession of the mine and equipment to Suckow Co. upon the termination of the lease. Appellees threatened further prospective legal entanglements with which Suckow Co. feared it would be unable to cope. Also appellees had by then taken

over all of Suckow's former customers and markets.

All of the aforesaid acts were done in pursuance of the said "General Conspiracy," and in order to control the world borax market and destroy appellants' business and competitive activities. The "General Conspiracy" was a continuing conspiracy and plaintiffs had no knowledge of its existence until about September, 1944, at which time the United States Government secured and filed an indictment against appellees, or some of them, for violation of the antitrust laws of the United States. Appellants would not have entered into the 1934 and 1942 agreements had they known of the existence of this conspiracy.

Finally, it is alleged that these acts of appellees damaged appellants in the sum of $5,000,000 and they are entitled to recover three times the amount of such damages, with costs and attorneys' fees. Judgment for $15,000,000 is demanded.

### Appellees' Motions to Dismiss and for Summary Judgment

Without answering the complaint appellees moved to dismiss the action upon the grounds that the complaint failed to state a claim upon which relief could be granted and that the action was barred by the California statute of limitations. In the alternative appellees moved for a summary judgment on the ground that there was no genuine issue as to any material fact and that appellees were entitled to judgment as a matter of law.

Appellees' motions were supported by three affidavits and documents attached thereto. The purpose of these affidavits and documents was to show appellants' prior knowledge or belief in the existence of the aforesaid conspiracy and to present the various releases referred to in the complaint.

A brief summary of these documents is necessary to an understanding of this case. Their recitals fill several hundred pages of the printed record on appeal.

The affidavit of Judge Allen W. Ashburn (who had previously been an attorney for Borax Ltd.) was employed as a means of introducing a copy of an affidavit of Dr. Suckow which had been served on Ashburn in 1930 in connection with an action then pending between Borax Ltd. and Suckow. Suckow, in the aforesaid affidavit (of December 6, 1930) accused Borax Ltd. and its subsidiaries of attempting to control and curtail world production of crude borax and to eliminate competition, and alleged on information and belief that a sharp rise in borax prices which occurred subsequent to December, 1929, "is directly due to some agreement between producers of crude borax and said Borax Consolidated Ltd., and its said subsidiaries known aforesaid as the 'Borax Trust'."

The affidavit of Albert H. Bargion, who was the official reporter at hearings held before the United States District Court in 1932 and 1933 in actions between Borax Ltd. and Suckow Co. was employed to introduce a transcript of certain statements made to the court in the course of those hearings by the attorneys for Suckow Co. These statements included allegations that the actions brought by Borax Ltd. were part of a plan to throttle competition and to create an unlawful monopoly in restraint of trade; that the suits were filed to force Suckow to sell out or to put him out of business, "so that they can control all the borax there is in the world."

The third affidavit filed in support of the motions was that of Moses Lasky, one of appellees' counsel in this action. It was presented and employed as a vehicle for the introduction of attached certified copies of pleadings and portions of transcripts from prior court proceedings between Borax Ltd. and Suckow Co., and a transcript of testimony given at a Senate Committee hearing, in all of which transcripts appellants or their attorneys had alleged (at various times from 1930 to 1934) that Borax Ltd. and its subsidiaries were trying to close down the Suckow mine pursuant to a plan to prevent Suckow from producing any ore in order to perfect and maintain a worldwide monopoly of the borax industry, and that the various law suits were pursuant to and a part of a conspiracy to restrain interstate and foreign trade by the

elimination of competitors and by price fixing and otherwise, in violation of antitrust laws.

Also introduced by and attached to the Lasky affidavit were photostatic copies of: general releases executed in 1934 by Dr. and Mrs. Suckow, Suckow Co. and Mojave in favor of Borax Ltd., Pacific Coast and U.S. Borax;[4] an agreement entered into in 1934 between Dr. and Mrs. Suckow and Pacific Coast; a general release executed in 1942 by Suckow Co. in favor of Borax Ltd. and Pacific Coast[5] a letter from a title insurance company (the escrow holder) showing the date of delivery of the 1942 release; stockholders' (of Suckow Co. and Mojave) authorizations for the agreements, sales and releases; a certified copy of a deed executed by Suckow Co. on December 21, 1942 and recorded on December 29, 1942 conveying all of its property in Kern County, California to the grantee, Borax Ltd. Affiant declared that the originals of the photostatic copies were in his possession and would be produced if the genuineness of the copies was questioned.

Appellants filed three affidavits in opposition to the motions. The affidavit of Paul Toebler, who as Dr. Suckow's executor is one of the appellants, was introduced primarily to show (through copies of letters and telegrams attached to the affidavit) the existence of the conspiracy alleged in the complaint; not to disprove the genuineness of the facts and documents shown by appellees' affidavits. The allegations in Toebler's affidavit were based on information and belief contrary to Rule 56(e), Fed. Rules Civ.Proc. 28 U.S.C.A. and accordingly appellees objected to the introduction of this affidavit.

The documents which were attached as exhibits to Toebler's affidavit were not original copies nor certified copies nor was any competent proof offered as to their authenticity. However, appellees specifically stated that they would not object to two of them, namely, a pleading in a former action in which Borax Ltd. had denied that it had any monopoly or that it had harassed or threatened Suckow, and a letter from Borax Ltd's. attorney to the trial judge in the bankruptcy case in which substantially the same denials were made.

Frank Buren, one of appellants' attorneys in this action (he had also represented them extensively in prior actions and was formerly the secretary of Suckow Co.) filed two affidavits in opposition to appellees' motions. He averred that the statements concerning the existence of a con-

---

4. These releases were denominated "General Release of all Claims," and the following extracts will illustrate the breadth of coverage intended to be given. The named corporations were released and forever discharged from "any and all actions and causes of action, claims and demands whatsoever, whether or not well founded in fact or in law, and of and from any and all and all manner of suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, trespasses, damages, judgments, executions, claims and demands whatsoever in law or in equity which * * * the undersigned has had or now has or which it or its successors * * * hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever, whether herein specifically mentioned or otherwise, from the beginning of the world to the date of these presents; and full satisfaction of all of said claims * * * [etc.] is hereby acknowledged.

"It is the specific intent and purpose hereof to release and discharge any and all claims and causes of action of any kind or nature whatsoever, whether known or unknown and whether specifically mentioned herein or not, which may exist or might be claimed to exist at or prior to the date hereof, and the undersigned specifically waives any right or claim of right to hereafter assert that any cause of action or alleged cause of action or claim or demand of any nature or kind whatsoever has been, through oversight or error or intentionally or unintentionally, omitted from this release."

5. In addition to the language quoted in footnote 4, the 1942 release "Without limiting the generality of the foregoing release," specifically granted release from any claims arising out of damage or injury to the mine caused by the lessee, "and for any other act of commission or omission in or pertaining to the use or occupation of the said leased premises."

spiracy which had been made by him in former actions (which statements had been introduced by appellees' affidavits) only related to the conspiracies involved in those particular law suits and not to the 1929 "General Conspiracy"; that although he and Suckow believed that Borax Ltd. and its subsidiaries were trying to control the borax industry, they had absolutely no knowledge or suspicion that Am. Potash or the Stauffer Co. were parties to the conspiracy; that they did not know of the existence of the 1929 conspiracy and had no proof or evidence (at the time the statements were made) of the existence of any conspiracy. Buren also averred that from his long and close association with Suckow he had personal knowledge that Suckow would not have entered into the 1934 agreements but for his extreme financial difficulties occasioned by the harassing tactics of appellees.

Upon this state of the record the trial court granted appellees' motions and entered judgment dismissing the complaint with prejudice, from which judgment this appeal was taken. It will be seen that several issues of law are presented, some of which by their nature are procedural; others substantive. We will first consider the

procedural issues. The pertinent language of the rules of civil procedure which are invoked is set forth in the margin.[6]

### The Procedural Issues

■ Appellants contend that the affirmative defenses of release and statute of limitations cannot be raised on a motion to dismiss but must, according to the terms of Rules 8(c) and 12(b), be asserted in an answer. We do not agree. In the first place a complaint may properly be dismissed on motion for failure to state a claim when the allegations in the complaint affirmatively show that the complaint is barred by the applicable statute of limitations. This is so because Rule 9(f) makes averments of time and place material for the purposes of testing the sufficiency of a complaint. Illustrative of this principle are Berry v. Chrysler Corp., 6 Cir., 150 F.2d 1002; Kithcart v. Metropolitan Life Ins. Co., 8 Cir., 150 F.2d 997, certiorari denied 326 U.S. 777, 66 S.Ct. 267, 90 L.Ed. 470; Panhandle Eastern Pipeline Co. v. Parish, 10 Cir., 168 F.2d 238; Gossard v. Gossard, 10 Cir., 149 F.2d 111. See also 2 Moore's Fed.Prac. (2nd ed.) §§ 8.28 (p. 1698); 9.07 (p. 1920); 12.08 (p. 2244); 12.10 (p. 2257). Also 1 Barron & Holtzoff, Fed.Prac. and Proc. §§ 281 and 349.

6. Rule 8(c), "In pleading to a preceding pleading, a party shall set forth affirmatively * * * release, res judicata, * * * statute of limitations, * * * and any other matter constituting an avoidance or affirmative defense."

Rule 9(f), "For the purpose of testing the sufficiency of a pleading, averments of time and place are material and shall be considered like all other averments of material matter."

Rule 12(b), "Every defense, in law or fact, to a claim for relief in any pleading * * * shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: * * * (6) failure to state a claim upon which relief can be granted * * *. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. * * * If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not ex-

cluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

Rule 56(b), "A party [defendant] against whom a claim * * * is asserted * * * may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof. (c) * * * The adverse party * * * may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

■ Secondly, affirmative defenses, even though not appearing on the face of the complaint, may be established upon motion to dismiss or for summary judgment when, by affidavits, depositions and admissions, a set of undisputed facts is revealed upon which the moving party is entitled to judgment as a matter of law. Clearly Rule 56 permits affirmative defenses to be raised in a motion for summary judgment. Gifford v. Travelers Protective Ass'n, 9 Cir., 153 F.2d 209; Kithcart v. Metropolitan Life Ins. Co., supra; Nahtel Corp. v. West Va. Pulp & Paper Co., 2 Cir., 141 F.2d 1; Altman v. Curtiss-Wright Corp., 2 Cir., 124 F.2d 177. And the amendment to Rule 12(b) (see footnote 7, infra) requires a motion to dismiss (for failure to state a claim) to be treated as a motion for summary judgment if matters outside the pleadings are presented to, and are not excluded by, the court. Butcher v. United Elec. Coal Co., 7 Cir., 174 F.2d 1003. Thus, the effect of the amendment is to permit one who moves to dismiss for failure of his adversary to state a claim, to show that under a set of facts which are undisputed, he is entitled to judgment as a matter of law. See 2 Moore's Fed.Prac. (2nd ed.) §§ 8.28 (p. 1698), 12.09 (p. 2255). In short, the motion to dismiss is thereby converted into a motion for summary judgment. See Advisory Committee's note to Rule 12(b), as amended; Kelly Co. v. R. F. C., 1 Cir., 172 F.2d 865.[7]

■■ We note that appellees' motions were to dismiss the complaint, or in the alternative, for summary judgment. Although the trial court "dismissed the complaint," we shall, in light of the above discussion, treat this disposal as a summary judgment in favor of appellees. Kelly v. R. F. C., supra. The net effect was the same—an adjudication on the merits, Rule 41(b). We accordingly hold that the affirmative defenses of release and statute of limitations were properly raised and presented by the procedure employed by appellees.

■ Appellants' next contention is that appellees, by filing their motions, admitted all of the well-pleaded allegations of fact in the complaint, and that the affidavits filed by appellees in support of the motion cannot be used to contradict such allegations in the complaint. Generally speaking, this is a correct statement of the law. Rule 56 was not designed to permit a trial of real and genuinely contested issues of fact by affidavit. Sartor v. Arkansas Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967. But when a general statement in a pleading is shown by specific facts stated in controverting affidavits, depositions and admissions, to be untrue, and the facts so presented are not denied and are not of such nature as to be peculiarly within the knowledge of the affiant, then no "genuine" issue remains for the trier of the facts. Koepke v. Fontecchio, 9 Cir., 177 F.2d 125, 127; Lindsey v. Leavy, 9 Cir., 149 F.2d 899; Piantadosi v. Loew's Inc., 9 Cir., 137 F.2d 534. See also Latta v. Western Inv. Co., 9 Cir., 173 F.2d 99, where (as in the instant case) an allegation in the complaint concerning lack of knowledge was disproved by affidavits setting forth court records in prior actions. The whole purpose of the summary judgment rule is to separate real and genuine issues from mere formal or pretended issues. 3 Moore's Fed. Prac. § 56.01, p. 3174 et seq.

■ The only factual allegations in the complaint which appellees' affidavits purported to contradict were the allegations that appellants had no "knowledge, intima-

---

7. The complaint in the instant case was filed on September 11, 1947, prior to the effective date of the amendments to the Rules, March 19, 1948. However, the amended Rules govern this proceeding which was then "pending"; there is no contention that their application would not be feasible or would work injustice. See Rule 86; Latta v. Western Inv. Co., 9 Cir., 173 F.2d 99. In any event the problem is unimportant because even prior to the amendment of Rule 12(b) a motion to dismiss accompanied by admissible matters outside the pleadings was treated by the courts as a "speaking motion" and equivalent to a motion for summary judgment. Latta v. Western Inv. Co. (supra, this note) and cases cited in footnote 1 thereof; Kithcart v. Metropolitan Life Ins. Co., 8 Cir., 150 F.2d 997.

tion or cause to believe" (prior to 1944) that a conspiracy among appellees existed, or knowledge that by such conspiracy appellees planned and engineered the financial destruction of Suckow. Appellees' affidavits showed beyond dispute that for many years (as indicated above) Suckow and his attorneys had repeatedly accused certain of appellees, both in and out of court, of violating the antitrust laws for the specific purpose of damaging Suckow and driving him out of business in order to effect and perpetuate these appellees' worldwide monopoly of the borax industry. Appellants' opposing affidavits did not attempt to refute these statements but merely explained that Suckow had no knowledge of the particular "General Conspiracy," of the year in which it was formed, or of the participation by all of the conspirators, and had no "proof" of the existence of any illegal conspiracy.

To what extent Suckow's knowledge of the particular "General Conspiracy" was material will be considered below. In any event we think it abundantly clear that the record shows that by 1934 Suckow knew he was being grievously damaged by acts of appellees, or some of them, and that at that time he believed, and charged, that these acts, which damaged him or his company, also violated the antitrust laws. A mere general allegation in the complaint to the contrary would not be sufficient to create a "genuine" issue of fact. This view finds support in other allegations set forth in the complaint to the effect that appellants would not have entered into the 1942 agreement and sale, or have given the aforesaid releases, but for appellants' past experience of continued persecutions by appellees, loss of markets through the past activities of appellees, and threats that appellees would renew their harassing tactics. Such allegations are inconsistent with appellants' general denial of any knowledge, belief or suspicion of the existence of a conspiracy to damage them.

### The Substantive Issues

Next we consider whether or not the undisputed facts shown by the pleadings and affidavits entitled appellees to a judgment as a matter of law.

Appellants frankly concede that in this action they do not attempt to set aside (on the basis of fraud or otherwise) the releases executed by them in 1934 and 1942, but contend that the said releases, or the procurement of them by the appellees, were "overt acts" in furtherance of a continuing conspiracy. This argument is difficult to understand. The releases were formally executed by *appellants,* and the record shows that in exchange for the 1934 agreement and releases appellants received $150,000 in cash and the satisfaction or release of various judgments and claims against them which amounted to about $500,000. The complaint itself shows that in exchange for the 1942 sale and release executed by appellants they received $350,000 in cash. We think that the trial court was entirely justified in finding that, "In every transaction with the defendants the plaintiffs have received consideration or an adjudication of their rights by a court having jurisdiction."

Appellants contend that these releases do not bar this action for the reason that they did not know of the existence of the cause of action at the time the releases were executed, and would not have executed them had they known of the existence of the 1929 "General Conspiracy." Section 1542 of the California Civil Code provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

As indicated above, the record conclusively shows that Suckow at least "suspected" that he was being grievously damaged by appellees' claimed illegal attempts to monopolize the borax industry, even though he lacked conclusive evidentiary proof at that time of all the details of the conspiracy. Therefore, under the California statute cited above, the releases must be held to bar this action. Furthermore both sets of releases specifically included all claims "known or unknown." Under California law such a release is fully effective and does not fall within the scope of

§ 1542, supra. Berry v. Struble, 20 Cal. App.2d 299, 66 P.2d 746.

We are not impressed with appellants' assertion that failure to include in the releases a specific release of "anti-trust actions" shows bad faith on the part of appellees. We do, however, think it likely that had *appellants* intended to exclude this kind of a cause of action from the broad ambit of the releases (see footnotes 4 and 5) they would (in view of their oft-repeated prior accusations concerning appellees' unlawful attempts to destroy them and to throttle competition) have specifically excepted antitrust actions from the broad and all-inclusive terms of the general releases which they executed.

We hold that the releases were properly shown by appellees' affidavits and that they constituted a defense to this action which entitled the appellees named in the releases to judgment as a matter of law.

Appellees contend that the other appellees not named in the releases were likewise released from any claim of liability for participation in the alleged conspiracy, under the elementary principle that the release of one joint tort feasor releases all others. Appellants have presented no arguments or authorities to the contrary. However, we think it unnecessary to decide the validity of this contention for, in our opinion, the other affirmative defense —that of the California statute of limitations—fully justified the entry of judgment in favor of all appellees.

All parties agree that the three year statute of limitations found in § 338 (1) of the California Code of Civil Procedure ("actions upon a liability created by statute"; the text of the above code section is set out in our Burnham case, supra) applies to an action of this character. However, their opinions differ as to the application of this statute to the facts of this case and on the effect of the Moratorium Act passed by Congress on October 10, 1942, 15 U.S.C.A. § 16 note. We agree with appellants that this Act suspended, until June 30, 1946,[8] the running of the various statutes of limitations against all antitrust actions and proceedings, civil and criminal, which were not already barred when the Act was passed. However, this interpretation does not aid appellants because in our view any cause of action in favor of appellants was barred by the above noted three year California statute of limitations at a time prior to the passage of the Federal Moratorium Act.

Appellants attempt to surmount the limitations obstacle by advancing the blunt proposition that in antitrust actions of the instant character the conspiracy is the gist or gravamen of the cause of action, and since this was a "continuing conspiracy," the California statute of limitations did not begin to run until the time the last conspiratorial "overt act" was committed, which "act" was asserted to be the 1942 agreement and sale.

This proposition was rejected by this court in Burnham Chemical Co. v. Borax

8. The Act of October 10, 1942, Ch. 589, 56 Stat. 781, Sec. 1, provided:
"The running of any existing statute of limitations applicable to violations of the antitrust laws of the United States, now indictable or subject to civil proceedings under any existing statutes, shall be suspended until June 30, 1945 * * *. This Act shall apply to acts, offenses, or transactions where the existing statute of limitations has not yet fully run, but it shall not apply to acts, offenses, or transactions which are already barred by the provisions of existing laws.
"Sec. 2. That this Act shall be in force and effect from and after the date of its passage."
By Act of June 30, 1945, Ch. 213, 59 Stat. 306, 15 U.S.C.A. § 16 note, the period of moratorium was extended to June 30, 1946. Three district court decisions have come to our attention in which the question of whether the Act applies to actions brought by private litigants as well as to those brought by the Government was considered and answered in the affirmative. United West Coast Theatres Corp. v. South Side Theatres, D.C., 86 F.Supp. 109; Tiffin Building Corp. v. Balaban & Katz Corp., D.C., 87 F.Supp. 121; Russelville Canning Co. v. American Can Co., D.C., 87 F.Supp. 484. The judges in those cases decided that the ordinary meaning of the words "civil proceedings" includes private suits, and that the legislative history of the Act does not reveal a contrary legislative purpose or intent. We agree.

Consolidated, supra. A civil cause of action under the Sherman Act arises at each time the plaintiff's interest is invaded to his damage, and the statute of limitations begins to run at that time. Momand v. Universal Film Exchange, D.C., 43 F. Supp. 996, 1006. See also Bluefields S. S. Co. v. United Fruit Co., 3 Cir., 243 F. 1, 20, appeal dismissed 248 U.S. 595, 39 S.Ct. 136, 63 L.Ed. 438, "The statute began to run when the cause of action arose, and the cause of action arose when the damage occurred." Cases relied upon by appellants in support of the theory that the statute does not start to run until the last overt act are criminal cases where the gravamen of the offense is the conspiracy. 15 U.S.C.A. § 1; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. But private civil antitrust actions are founded, not upon the mere existence of a conspiracy, but upon injuries which result from the commission of forbidden "overt acts" by the conspirators, 15 U.S.C.A. § 15; Foster & Kleiser v. Special Site Sign Co., 9 Cir., 85 F.2d 742, 751, and cases there cited.

■■■ Therefore, the only actions of the character here being considered which would not be barred by the noted California statute of limitations would be those arising from damages caused by illegal "overt acts" of appellees which occurred *within* the three year period immediately preceding October 10, 1942 (the date of the enactment of the Federal Moratorium Act, supra), or thereafter. The only acts which appellees contend were "overt acts" occurring during this particular period were the purchase of all of appellants' borax interests and the procurement of the releases, which transactions took place in December of 1942. As we said previously, we cannot understand how these actions can logically be said to be illegal "overt acts" committed by appellees to the damage of appellants. In exchange for the sale of their proprietary interests and for the execution of the 1942 release appellants received $350,000 in cash. The complaint does not charge that the 1942 sale and release was made under duress or compulsion or was other than a voluntary transaction.

It is true that the complaint does allege that appellants made the sale and executed the 1942 release as a result of past experience of harassment and persecution by appellees, and threats of a renewal of similar activities in the future. However, appellants were not forced to sell. It cannot even be said that the "threats" rose to the level of economic coercion, for at the time of the 1942 transaction appellants were not even engaged in the borax business and had not been so engaged since 1934, which was thirteen years before this action was filed. Appellants' only remaining interest in the borax business (in 1942) was that of lessor of their one-half interest in the borax mine, and as such they were collecting royalties from appellee Pacific Coast on the borax as it was mined by this appellee-lessee. This lease had two years to run at the time of the 1942 sale.

■■■ The record induces the firm conviction that by the 1942 agreement and sale, the parties thereto were voluntarily wiping the slate completely clean of controversies by a full settlement of any and all existing differences between them. We are not aware of any principle of law which requires private monopolists to be treated in any different fashion than other tort feasors in the matter of entering into binding private settlement agreements arising out of demands against them for damages. Such settlements in no wise obstruct possible criminal prosecutions which might be instituted by the Government, nor do they defeat the Congressional purpose of allowing private claimants in this class of actions the right of redress of their grievances in our courts. We cannot and should not characterize the act of appellees in entering into a voluntary "peace pact" with appellants as an illegal or "overt act." It may well be that if appellants had originally possessed all of the evidentiary proof which they now claim to have they would not have sold out or made the release

agreements, but would have brought this action long ago.[9]

Appellants next contend that the California statute of limitations did not run against them because the existence of the so-called 1929 "General Conspiracy" was fraudulently concealed from them by appellees.[10] This argument possesses no greater validity than the contention (discussed and rejected above) that the conspiracy is the gist or gravamen of appellants' cause of action. The record before the trial court makes clear beyond dispute that at all times pertinent to this inquiry appellants knew and believed that they were being grievously damaged by Borax Ltd. and its subsidiaries and agents and were keenly aware that the acts of appellees had caused and were causing damages, and knew, or had reason to believe, and did believe, that these acts were committed in violation of Federal antitrust laws. Thus the ultimate and determinative facts constituting the legal basis of this action were known to appellants. This fact clearly appearing from all of the record before the trial court, the claimed ignorance of the existence of a formal conspiracy along with its exact date, precise terms, specific objectives and other evidentiary matter, would be immaterial so far as regards the question of the California statute of limita-tions, as would any alleged concealment thereof. Furthermore, appellants' bare allegation of "fraudulent concealment" is but a conclusion of law which falls far short of the particularity of statement required by Rule 9(b). And the undisputed facts showing the extent of Suckow's knowledge (discussed above) clearly dispel the claim of concealment.

The final contention is that the trial court erred in denying appellants' motion to alter the judgment in such manner as to permit appellants to amend their complaint for the third time. Appellants did not submit a copy of a proposed third amendment nor suggest to the trial court or to this court the nature or text of the amendment which they desired to make. Nor did they indicate in what respect this amendment would or could overcome appellees' defenses. Under Rule 15(a) a party may, before a responsive pleading is filed, amend his pleading once without leave of the court. The trial court has discretion to allow subsequent amendments. Young v. Garrett, 8 Cir., 159 F.2d 634. Under the circumstances of this case we cannot find abuse of discretion in the trial court's denial of the motion. Maloney v. Hammond, 9 Cir., 176 F.2d 780, 782.

The judgment of the trial court should be and is affirmed.

---

9. In this connection the record shows that in the bankruptcy proceedings in 1934, counsel for Suckow, after having repeatedly accused appellees of violations of the antitrust laws, stated, "I claim that they are true and I claim that those allegations will be proved in the proper proceedings at the proper time."

10. The only allegation in the complaint on fraudulent concealment appears in Paragraph 91 where it is charged that "said 'General Conspiracy' was fraudulently concealed by said defendants from plaintiffs and each of them until the time of discovery thereof [1944] as aforesaid by plaintiffs." In the Burnham case, supra, the complaint averred that the plaintiffs had accused the defendants of wrongdoing and that the defendants had denied the accusation, and we there held the said averment to be insufficient. The complaint in this case does not even con-tain such an allegation of accusation and denial. A claim of fraudulent concealment made below by appellants (appearing in documents filed to oppose appellees' motions) was that certain appellees had denied that they were guilty of monopoly practices which violated the antitrust laws when so accused by appellants in certain litigation and hearings over 13 years before this suit was started.

In the Burnham case we held that a denial of an accusation of wrongdoing (where such an answer was in practical effect no more than a failure to disclose the existence of a cause of action) was not a "fraudulent concealment," and therefore the statute of limitations was not suspended merely by reason of appellants' ignorance of or failure to "discover" the existence of the cause of action.