RADIO CORPORATION OF AMERICA,
Plaintiff-Counter-Defendant

v.

RAULAND CORPORATION and Zenith
Radio Corporation, Defendants-
Counter-Claimants.

ZENITH RADIO CORPORATION and
Rauland Corporation, Cross-
Claimants,

v.

RADIO CORPORATION OF AMERICA,
General Electric Company, and Western
Electric Company, Inc., Cross-Defend-
ants.

Civ. A. No. 48 C 1818.

United States District Court
N. D. Illinois, E. D.
July 17, 1956.

See, also, 21 F.R.D. 113.

Thomas C. McConnell, Joseph S. Wright and Philip J. Curtis, Chicago, Ill., for Zenith Radio Corporation and The Rauland Corporation.

Kirkland, Fleming, Green, Martin & Ellis, Chicago, Ill., for Radio Corporation of America.

Sidley, Austin, Burgess & Smith, Chicago, Ill., for Western Electric Company.

Essington, McKibbin, Beebe & Pratt, Chicago, Ill., Albert C. Bickford, Thomas Thacher and Simpson, Thacher & Bartlett, New York City, for General Electric Company.

IGOE, District Judge.

The court has before it for decision three motions: (a) a motion by Radio Corporation of America (plaintiff and counter-defendant) to strike and dismiss the amended and supplemental counterclaim filed on May 23, 1956; (b) nearly identical motions filed by General Electric and Western Electric Co., Inc. (cross-defendants) asking that Zenith Radio Corporation and The Rauland Corporation, who are defendants and counter-claimants, be required to take an election either to dismiss GE and Western out of the case on the counterclaims, or to cut the damage period to a date no earlier than two years prior to the filing of the amended counterclaim of February 11, 1954. GE and Western also move that the allegations of pendency of government antitrust suits against them as tolling the statute of limitations be stricken from the amended and supplemental counterclaim.

### The RCA Motion To Strike and Dismiss

There is little if anything in the latest motion of RCA which has not already been argued by counsel and decided by the court on two previous occasions. The same, or very similar points, were made in opposition to the motion for leave to amend which was decided February 11, 1954 and in the later motion to dismiss which was decided by the court's opinion of March 29, 1955. For purposes of this case, that decision disposed of such questions as whether one injured in his business by reason of exclusion from foreign trade by a conspiracy may recover for loss of profits; that royalty payments

exacted under threat of suit by an illegal combination of "block-booked" patents are properly an element of damage; and that recovery may be had for attorney's fees and costs of defending against infringement claims asserted as part of a conspiracy to restrain trade. In that opinion this court also held that the previous counterclaim satisfied the requirements of the Federal Rules of Civil Procedure, 28 U.S.C.A., in that it contained a sufficient statement of the facts relied upon and the claims for relief sought. What was said upon these points, as well as upon the applicability of section 17 of the Illinois Limitations Act, Ill.Rev.Stat.1955, c. 83, § 18, is applicable with equal force to the current objections to the amended and supplemental counterclaim.

RCA argues that insofar as the latest counterclaims relate to Australia, Holland and England, the applicable limitation would outlaw any claim prior to January 27, 1954. This is a valid point only if the amendment does not relate back to the previous claims. The previous counterclaim sought money damages for loss of export trade to Canada, and alleged in rather general terms that the parties had divided the world into exclusive territories and that Zenith and Rauland had been excluded from various competitive markets (Amendment to the Counterclaim, Par. 9). Under the circumstances, the addition of money damage claims for loss of profits in foreign trade with Australia, England and Holland through operation of the same world-wide conspiracy first alleged, would appear to relate back to the earlier and more general pleading. As a matter of fact, it appears that the latest amendment was made for the purpose of answering the repeated demands of counsel for RCA that they be informed precisely as to the particular countries from which counter-claimants allege exclusion.

There is no merit in the argument of laches and that the court should strike this amendment because it was not timely filed. Leave to amend is within the sound discretion of the court, and it should be freely permitted, particularly when the need for amendment is brought on by positions asserted by the other side. That the damages sought are greatly increased has no bearing on the right to amend; in any case damages must be proved at the trial and if counterclaimants can only prove the smaller amount, then the larger claim in the pleading can have no effect on the judgment.

### The GE and Western Motions to Dismiss or Limit the Period of Damages

GE and Western have filed motions asking an order requiring counterclaimants to elect either to dismiss them out of the case or to limit the damage period applicable to all of the parties to February 11, 1952, which is two years prior to the filing of the treble-damage amendment to the counterclaim. The argument is that since this is an action sounding in tort, and against joint tort feasors, there can be only one judgment, which cannot apportion damages among the parties, and which must be for a common damage period—the shortest period applicable to any of the parties. In support of this position, they rely upon Essaness Theatres Corp. v. Balaban & Katz et al., D.C.N.D.Ill.1955, C.C.H.Trade Reg.Repts. Par. 68, 152.

That decision has been examined with a great deal of care, and this court wishes to express complete agreement with the fundamental principles discussed therein. Insofar as a case involves a tort, a single judgment is required, and there can be no enforced contributions or apportionments among joint tort feasors.

This is not to say, however, that there can be but a single judgment covering several different causes of action combined in one proceeding. Under Rule 18 of the Federal Rules of Civil Procedure litigants are encouraged to bring into one proceeding all the causes of action that may lie between the parties, and quite obviously the rules contem-

plate that several judgments may be necessary or appropriate to dispose of a litigation involving multiple claims. It therefore would seem that in a case of several causes of action the court may enter several judgments, as the interests of the parties may appear.

It is my opinion that the position of GE and Western must turn on whether this case involves a single tort which must be disposed of by a single judgment, or whether there are a number of different causes of action making it appropriate for the entry of more than one judgment.

Under the pleadings, Zenith and Rauland each seek separate damages for loss of profits in export trade to various named countries and attorneys' fees and costs of defending against infringement claims, which damage is alleged to have occurred between January 14, 1947 and January 1, 1956. Recovery is sought against RCA, GE and Western jointly and severally on these items and over this period. In another and separately pleaded count, Zenith alone seeks a judgment against RCA and GE for royalties paid between June 22, 1940 and January 1, 1947, said to have been extorted pursuant to the conspiracy. In other words, the pleadings ask for three separate judgments:

1. in favor of Rauland, against GE, RCA and Western for the period 1947–1956;

2. in favor of Zenith, against GE, RCA and Western for the period 1947–1956;

3. in favor of Zenith, against GE and RCA, for the period of 1940–1947.

There can be no really serious argument over the point that a cause of action for damages under the antitrust laws does not arise with the formation of an illegal conspiracy, but rather when the interests of the plaintiff are invaded by such a conspiracy so as to cause him loss and damage. Suckow Borax Mines Consol. v. Borax Consolidated, 9 Cir., 1950, 185 F.2d 196; Foster & Kleiser Co. v. Special Site Sign Co., 9 Cir., 1936, 85 F.2d 742; Momand v. Universal Film Exchange, D.C.S.D.N.Y.1947, 43 F.Supp. 996, 1013. That being so, each continued invasion of interest causing loss and damage is in effect a new cause of action, and the statute of limitations begins to run when it occurs, as the above cases hold.

Applying these principles to the pleadings here, Zenith and Rauland, the counterclaimants, allege a continuing conspiracy to shut them out of export trade from the United States to Canada, England, Australia and Holland over a period of years commencing in 1947, and upon proof to this effect each would be entitled to judgment against the cross-defendants for three times the damages occurring in this period. Zenith also alleges damages from 1940 to 1947 in the form of royalty payments illegally extorted, and asks that this judgment run against GE and RCA. This appears to be a separate and distinct cause of action which is appropriate for separate judgment.

I will agree that for any particular time period there can only be one judgment and one recovery, whether that is against one, two or three of the alleged co-conspirators, for the same reasons that were stated by Judge Campbell in the Essaness case. Movants argue that the Essaness case also involved damages at different times from a continuing conspiracy and that it therefore is authority for the proposition that in this sort of case there can be only one judgment, regardless of the number of causes of action. That distinction does not appear from the opinion, and I am convinced that it would be error for the court to force a party in a multi-claim proceeding either to dismiss out of the action all the parties who cannot be held as to all the causes, or to dismiss out of the complaint all of the charges which cannot be proved as to all of the parties over a common period of limitations.

If it should appear at the trial that there is liability for damages occurring at different periods, and that

counterclaimants are entitled to judgment as to some, but not all, of the cross-defendants, then judgments can be entered as their interests may appear; that is, if there is shown to be a damage period in which each of the cross-defendants is jointly liable, one judgment can be entered for that cause or series of causes, and if it should also appear that there is another and severable damage period in which only one or two of the cross-defendants may be liable, then a separate judgment can be entered for that cause.

### The Tolling of the Statute of Limitations by the Government Suit

Another and more difficult problem is raised by that portion of the amended pleadings which raises the government complaints in the cases of U. S. v. A. T. & T. et al., case No. 17–49, U.S.Dist.Ct., Dist. of New Jersey, and U. S. v. General Electric et al., Civil action No. 1364, U.S. Dist.Ct., Dist. of New Jersey, as tolling the applicable statute of limitations against Western and GE. Counterclaimants assert that the pendency of these cases tolled the statute of limitations from January 14, 1949 and January 27, 1941 to January 4, 1956 and November 8, 1953, respectively.

Western and GE argue strenuously that these government antitrust cases dealt solely with telephone equipment and lamps, and that since the instant case involves radio apparatus, there was no matter complained of in those cases which has any relationship to the charges of a conspiracy to injure the business of Zenith and Rauland in radio apparatus. Western and GE ask that the charges in this respect be stricken from the counterclaim.

Section 5(b) of the Clayton Act (15 U.S.C.A. § 16) which governs this matter is a simple and straight-forward pronouncement:

"Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter * * *."

Despite the apparent simplicity of determining whether this case is based in whole or in part on matters complained of in the government actions, counsel are at wide variance on the meaning and scope of this section. Western and GE argue that the same allegations must appear in both cases, that there must be the same conspiracy, for the same purpose and with the same overt acts and thrust upon competition. In support they cite the case of Steiner v. 20th Century-Fox Film Corp., 9 Cir., 1956, 232 F.2d 190. Zenith and Rauland take the position that the test is whether the government complained of any matter, agreements or arrangements on which the private action is grounded, either in whole or in part. They cite the case of Grengs v. 20th Century-Fox Film Corp., 7 Cir., 1956, 232 F.2d 325.

In an effort to resolve this conflict, counsel have inundated the court with a mass of documents, consisting of the complaints, decrees and part of the exhibits in both the government cases and this case.

I can see no way to avoid a comparison of the pleadings in the various cases to determine whether there was in fact any matter as to which the statute was tolled by the pendency of the government actions.

### Tolling as to Western Electric

It is appropriate to turn now to a comparison of the pleadings in the instant case and those in the case of United States v. A. T. & T. et al., which is set forth in Par. 11 of the Amendment and Supplement to the Counterclaim. The government's complaint is long and involved, but in Pars. 91 through 95 it sets

up that there was created a cross-licensing arrangement in about 1920 between A. T. & T. and Western on the one hand and the "radio group" (consisting of General Electric Company, Radio Corporation of America and Westinghouse Electric & Manufacturing Company), which arrangement had the effect of reserving to the radio group the manufacture and sale of radio receiving sets and of vesting in the Bell System a monopoly in the manufacture, sale and use of equipment for two-way radio telephony, the supplying of wire facilities for use in connection with radio broadcasting, and for the exclusion of the radio group from the entire field of wire telephony. (Complaint Pars. 91, 92, pages 43–45). Paragraphs 93 and 95 of the Complaint describe the later acts of these parties pursuant to the "1920 treaty" including the ownership of stock by A. T. & T. in the Radio Corporation of America and its refusal to license commercial radio patents during the early period. The Complaint describes a cross-licensing with the radio group in 1926 and its amendment after attack by the government as a result of the 1932 consent decree in the case of U. S. v. RCA et al.

In the prayers of the government complaint, Prayer 18 at pages 72 and 73, the government sought a termination of the outstanding contracts and understandings, practices and relationships between Western Electric, General Electric, RCA, Westinghouse and others "which are referred to in this Complaint or which eliminate or restrain competition among such companies * * *."

In the instant counterclaim Zenith and Rauland plead that there has been a combination and conspiracy between A. T. & T., Western Electric, General Electric, RCA, Westinghouse and a number of foreign companies to divide up the entire business of electronics into particular fields and branches and to vest a monopoly in the field of telephony in A. T. & T. and Western, a monopoly in the radio field in RCA and a monopoly in industrial and other electrical uses in GE and Westinghouse. (Answer and Counterclaim Par. 5)

It is alleged in the counterclaims that a means and method of achieving this has been the pooling of all of the patents of all of the parties and granting the sole right to all of the pooled patents of the participants to RCA in the radio field, to the telephone group for the telephone field and to GE and Westinghouse for their particular fields. It is quite apparent that the agreements which are referred to in the counterclaims as setting up the conspiracy therein alleged are the same agreements which are referred to in Pars. 91 to 95 of the government's complaint against A. T. & T. and Western and that it is these same agreements which the government asked to be terminated in the prayer for relief referred to above.

It is true that the cause of action set forth in the counterclaim is based on damage and injury occurring from acts alleged to have hindered and hampered business in the sale of radio receiving apparatus, while the government's complaint was designed to restore competitive conditions in the field of telephony. As I understand it, the principal difference between telephony and radio is that communications by telephone are generally over wire, whereas radio communications are wireless. Nevertheless, the basic conspiracy complained of in the counterclaims and as set forth in Pars. 91 through 95 of the government complaint in the telephone case appears to be the same.

If the telephone case had resulted in an adjudicated final decree which had determined that these agreements were an illegal division of fields for the purpose of setting up monopolies in the radio and telephone fields, I would have no hesitation in concluding that such a judgment would be admissible in evidence against Western under the provisions of Sec. 5 (a) of the Clayton Act (15 U.S.C.A. § 16(a)).

In considering Sec. 5(b) it must be remembered that the test is not the re-

lief ultimately granted, but what the government complained of, regardless of whether the charges are ever supported and despite the fact that they may have been completely without any foundation.

 It would appear therefore that in so far as the counterclaim is based upon acts pursuant to or involving a conspiracy between RCA, GE and Western to divide up the fields of business by interchange of patent rights and licenses under the agreements of 1920, 1926 and 1932 and amendments and supplements thereto, the statute of limitations is tolled as to Western Electric during the time between January 14, 1949 and January 4, 1956 when the consent decree was entered terminating the case.

### Tolling as to General Electric

The government's action against General Electric was commenced on January 27, 1941. A final decree and judgment was entered on October 8, 1953 and the time for filing an appeal expired November 8, 1953—less than two years prior to the time GE was brought into this suit as a counterclaim-defendant on February 11, 1954.

The government complaint concerned itself principally with GE's arrangements and agreements for the purpose of monopolizing and restraining competition in the incandescent lamp business and it resulted in a decree in the U. S. District Court dedicating the incandescent lamp patents on a royalty free basis.

The complaint in the so-called GE lamp case was very voluminous and complex and there can be no dispute but that the government was thinking primarily in terms of stopping the monopolistic practices in the incandescent lamp business. However, in Par. 116 of the complaint there is reference to the entering into and maintaining of patent pooling and licensing agreements with companies engaged in radio, telephony, lighting and other related industries and in Par. 106 of the complaint there is a listing of agreements entered into between GE and the principal foreign lamp companies since 1927, including an agreement between International GE and Associated Electrical Industries Ltd., the British Thomson Houston Company Ltd., Metropolitan Vickers Electrical Company Ltd., The Edison Swan Electric Company Ltd., and Ferguson Pailin Ltd., all of England.

In the prayers of the government complaint, at page 159, the government asked that these agreements specifically referred to be each adjudged "to represent an illegal combination and conspiracy to restrain and monopolize interstate and foreign trade and commerce, and that the observance of each of such agreements in any respect * * * be perpetually enjoined."

Counsel for counterclaimants have attached to their papers a copy of the agreement referred to in Par. 106 of the complaint, which agreement apparently had heretofore been produced by General Electric in the course of the discovery proceedings in the instant case.

It is conceded by counsel for GE that the agreement in question was not limited to lamps and it is apparent from its terms that it applied to any products, including radio and radio apparatus, in which any of the signatories had an interest.

Under Article II of this agreement (which was government Exhibit 43 in the lamp case) GE and the AEI group divided up the world into both exclusive and non-exclusive territories, reserving to the British companies the following exclusive territory: Great Britain, Northern Ireland, Irish Free State, Isle of Man, Malta and Cyprus. There was reserved as the exclusive territory of General Electric the following: United States of America, the Dominion of Canada, France, Greece, Belgium and Luxembourg, Japan and its Colonies, and Spain and Portugal.

It is to be noted that Article IV(D) at page 14 of the GE–AEI agreement provides that in the granting of any licenses or sublicenses under the patents on inventions of GE by the British companies, one of the conditions is that such licenses will be limited to the exclusive terri-

tory of the British companies, except that licensees may be authorized to export apparatus and devices and supplies to non-exclusive territories outside of North and South America.

In Article IV(I), the British companies covenant that during the period of the agreement they shall not without written consent of GE engage directly or indirectly in the manufacture or sale of any apparatus in the United States and Canada and that they will not engage in such business in any other portion of the exclusive territory of GE where GE has granted any other third party an exclusive license.

In Article V (C–1) GE agrees that any license which it grants under the patents of the British companies in its exclusive territories will be conditioned on the express understanding that the license or sub-license will be limited to the exclusive territory of GE, with the proviso that GE may authorize any of its licensees in the United States or Canada to export apparatus to any other territory in North and South America in which GE "has selling rights from the British companies." This clause concludes with the provision "the General company shall give to the British companies written notices of the granting of all such assignments, transfers or licenses and shall take every reasonable measure and precaution that the rights or interests of the British companies shall not be interfered with or damaged."

Article V (H) provides that GE will not engage directly or indirectly in the manufacture or sale of any apparatus in the territory of the British companies.

Article II (K) of the agreement provides that the rights which are granted by GE to the British companies "to sell in Denmark, Sweden, Norway, Finland, Estonia, Latvia, Lithuania, Poland, Czecho-Slovakia, Hungary, Jugoslavia, Roumania, Bulgaria, Switzerland, Turkey, Holland, Newfoundland * * *" are not intended to include electric lamps, radio valves or tubes or any apparatus "for which any selling rights of the Gen-

eral company are exclusively controlled" by companies other than GE, a list of which is said to be set out in Exhibit C to the contract. Among other things, Exhibit C sets forth an agreement with N. V. Philips Gloeilampenfabrieken for radio purpose apparatus for Holland, Czecho-Slovakia, Denmark, Estonia, Finland, Latvia, Lithuania, Norway, Sweden, Switzerland and Poland.

In short, this agreement appears on its face to be a complete exchange of all patent rights and information and know-how between GE and its subsidiaries and affiliates on the one hand, and the group of English companies on the other, as well as a division of the world into exclusive territories and the commitment not only to stay out of the territories of the other parties but to keep everyone else out. As I read this agreement GE could not grant a license to a licensee here in the United States, for instance, that would not forbid him to export radio apparatus to England or any other exclusive territory of the British companies. Similarly, the agreement would appear to prevent the British companies or any licensees or persons holding under them from engaging in export trade to the United States or Canada.

Counsel for counterclaimants have submitted exhibits indicating that at least one of the British signatories of the GE–AEI agreement is a member of the English Patent Pool which is alleged to be a part of the conspiracy to keep Zenith and Rauland from engaging in export trade in radio apparatus from the United States to England and to Australia and Holland, parts of the world dealt with in the GE–AEI agreement. It appears also that GE is a member of Canadian Radio Patents Ltd., the so-called Canadian pool which is asserted to be an instrumentality of the conspiracy which has prevented Zenith and Rauland from exporting radio apparatus from the United States to Canada.

From the face of this agreement GE acquired rights in the patents in Canada and the United States of the British com-

panies which may have been used against the counterclaimants here in the United States and in export trade to Canada and by which the British companies acquired British patents of General Electric which may have been used against counterclaimants' export trade to England. While the government was primarily concerned with the incandescent lamp business in the complaint referred to, it is also quite clear that the government considered this as part and parcel of a division of fields and territories between the lamp, radio and telephone groups and that an effort was specifically made to terminate the arrangements created in the GE–AEI agreement of 1939 as they applied to all apparatus, including radio. In the court's opinion on final judgment reference was made to the government's position that the foreign agreements should be terminated in their entirety, but this the court refused to do. United States v. General Electric et al., D.C.N.J. 1953, 115 F.Supp. 835, 843.

The test, however, is not whether the court actually adjudicated this contract, but whether the government complained of it, and whether it is a matter on which counterclaimants base their case in whole or in part.

In the GE case the government clearly attacked the legality of a specific agreement dividing up various markets of the world between a number of companies, and in the instant counterclaim it is alleged that the effect of just such division has been to prevent export trade from the United States to Canada, England, Holland and Australia. Under the circumstances, it would appear that in so far as GE is concerned and insofar as the counterclaims are based upon damages as the result of territorial arrangements between GE, the British companies mentioned in the GE–AEI agreement, Philips of Holland and others having contractual arrangements of a similar nature with GE, such as are referred to in the agreement between GE and the British companies, the statute is tolled from January 27, 1941 to November 8, 1953.

## Conclusion

For the reasons stated, the motion of RCA to strike and dismiss the amended and supplemental counterclaim is denied; and the motions of GE and Western to require an election either to dismiss them out of the case or limit all claims to a two year damage period, and to strike the allegations of the prior government antitrust cases from the pleadings, are denied.