366 F.2d 617
 S & S LOGGING CO., Inc., Appellant,
v.
B. G. BARKER and Jane Doe Barker, his wife, Bob Jones and
Jane Doe Jones, his wife, Ivan O. Jones and Jane Doe Jones,
his wife, Harold C. Chriswell and Iris E. Chriswell, his
wife, Wm. O. Benecke and Ruth Benecke, his wife, Summit
Timber Company, a Washington corporation, and Eclipse Timber
Co., a Washington corporation, Defendants, Lewis Hovde and
Jane Doe Hovde, his wife, and the Bank of Sumas, a banking
corporation, Additional Defendants, (Harold C. Chriswell et
ux. and Wm. O. Benecke et ux. of Defendants), Appellees.
 No. 19896.
 United States Court of Appeals Ninth Circuit.
 Aug. 24, 1966.
 
 Joseph T. Pemberton, Bellingham, Wash., for appellant.
 John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Edward Berlin, Attys., Dept. of Justice, washington, D.C., Wm. N. Goodwin, U.S. Atty., Seattle, Wash., for appellees.
 Before POPE, BARNES and MERRILL, Circuit Judges.
 POPE, Circuit Judge.
 
 
 1
 Appellant brought suit against appellees and others under section 4 of the Clayton Act, 38 Stat. 731 (1914), 15 U.S.C. Sec. 15 (1964), charging a conspiracy to monopolize and control the sale of National Forest Service timber in Mount Baker National Forest, Washington, in violation of Sections 1 and 2 of the Sherman Act, 26 Stat. 209 (1890), 15 U.S.C. Secs. 1, 2 (1964).
 
 
 2
 Appellee Chriswell is Supervisor and appellee Benecke is Timber Staff Assistant of the Mount Baker National Forest. It is charged in the complaint that pursuant to the alleged conspiracy appellees canceled an auction sale of timber on which appellant was successful bidder and thereafter awarded the contract of sale to other named conspirators, also joined as defendants.
 
 
 3
 The appellees moved for dismissal of the complaint, pursuant to F.R.Civ.P. 12(b)(6), on the ground that the complaint failed to state a claim upon which relief could be granted. In the alternative appellees asked for summary judgment. The action was dismissed as to appellees.
 
 
 4
 * As we shall note hereafter the motion for summary judgment was supported by affidavits and depositions, which raises the question whether the whole motion should not be treated as one for summary judgment. But before reaching that question, it is appropriate to consider whether the complaint, on its face, and taken by itself, states a claim against these appellees.
 
 
 5
 The trial Judge, in sustaining the motion, relied upon the case of Barr v. Matteo, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434. There the opinion of Mr. Justice Harlan, for four Justices, held that governmental officers have an absolute privilege and immunity against suits for damages against them arising out of actions taken by them 'within the outer perimeter of (their) line of duty * * * despite the allegations of malice in the complaint.' In ammouncing this rule the Court quoted at length what it said Judge Learned Hand had 'admirably expressed' in Gregoire v. Biddle, 2 Cir., 177 F.2d 579, 581, as follows: "It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. * * *
 
 
 6
 'The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. * * *" (360 U.S. 571, 572, 79 S.Ct. 1335, 1339.)
 
 
 7
 Judge Hand's statement was again alluded to with approval in the recent case of Garrison v. State of Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125.[1] The complaint here states clearly just what it is claimed that the defendants did. What they actually did was to reject all bids at the first sale and arrange for another sale of the same timber. These were acts which were clearly within the perimeter of those defendants' duties, or, as put by the Fifth Circuit in Norton v. McShane, 332 F.2d 855, 857, they were 'acting within the scope of their authority or in the discharge of their duties.'
 
 
 8
 This immunity from suit granted to governmental employees, is not limited to those of cabinet rank, nor to those exercising judicial or quasi-judicial functions. As stated in Barr v. Matteo, supra, 360 U.S. pp. 572-573, 79 S.Ct. p. 1340: 'We do not think that the principle announced in Vilas (Spaulding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780) can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts. The provilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.' And in O'Campo v. Hardisty, 9 Cir., 262 F.2d 621, 625, a suit against employees of the Internal Revenue Service, we said: 'At an early date the rule was extended to protect legislative and administrative officers. * * * That minor governmental officers are within the scope of the immunity is well established.'[2]
 
 
 9
 The allegations of the complaint using the words 'conspired with each other and with the defendants' and 'conspired to and arranged for another sale' and a 'conspiracy to injure the plaintiff' do not operate to take this case out of the Gregoire rule.
 
 
 10
 In Bershad v. Wood, 9 Cir., 290 F.2d 714, the wrongful levy by the defendant officers in that case was alleged to have been done 'wrongfully, maliciously, without probable cause, and in willful disregard of the rights of plaintiff.' This court affirmed a judgment for the defendant officers relying upon a substantial number of decisions which rejected similar claims. This court there expressly approved and adopted the Gregoire rule. The allegations here, as to 'conspiracy' can mean no more than the allegations in Bershad, or in Gregoire where it was asserted that the defendants 'conspired together and maliciously and wilfully entered into a scheme to deprive the plaintiff * * * of his liberty contrary to law.'
 
 
 11
 We cannot say that it was not within the power of these defendants to reject all bids on the first sale. Such power is granted to these officers by the Forest Service regulations found in 36 CFR (1960 ed.) 221.10(a)(1). The actual basis for the action here is necessarily the cancellation of the first sale by the rejection of the bid and the re-advertising of the property. No basis for depriving the officers of the absolute immunity granted to them can be found here through an allegation that this was done through a 'conspiracy' with others. The so-called conspiracy would not result in harm to plaintiff if nothing were done pursuant to it. What was done here was an act specifically authorized by the regulations. That that act is motivated by a conspiracy adds nothing to plaintiff's claim and makes no stronger case than the case mentioned by Judge Hand in Gregoire where the officer used his power to 'vent his spleen' upon others or for any other personal motive 'not connected with the public good' or where he exercises a power 'dishonestly', or where, as in our Bershad case, the officer acts 'wrongfully, maliciously, without probable cause and in willful disregard of the rights of plaintiff.'
 
 
 12
 In Bershad, supra, we cited with approval the case of Yaselli v. Goff, 2 Cir., 12 F.2d 396, 56 A.L.R. 239. The very proposition just expounded is discussed there by the court and dealt with in an appropriate manner. The plaintiff in that case had pleaded that the defendant officer had conspired with other defendants to prosecute the plaintiff maliciously, and, in furtherance of the plan, 'confederated and agreed' that the officer would do the things with which he was charged in the complaint. The pleading contained 'other allegations concerning the details of the plan of conspiracy.' The court, in noting that this reference to a conspiracy no more takes the case out of the ordinary rule than would an allegation that the acts were performed wilfully and maliciously, stated as follows: 'This raises the question whether the immunity which attaches, as we hold it does, to a prosecuting officer, applies to shield oned who conspires wilfully and maliciously to get himself appointed as prosecutor, in order that he may wilfully and maliciously indict and prosecute the person he seeks to punish. In our opinion, the reasons which compel us to hold that one who obtains an appointment as a prosecuting officer of the government is immune from civil liability for acts done by him in the discharge of his official duties apply in like manner to protect him against such a charge as that he was governed by improper motives in securing the appointment. The important fact is that he was appointed to the office, and, having been appointed, the public interests require that he shall be free and fearless to act in the discharge of his official duties. If he cannot be charged with acting willfully and maliciously after he gets appointed to the office, no more can he be charged with having conspired to get into the office in order to act willfully and maliciously after he gets his appointment. The one charge is as much to be feared as the other, and is equally derogatory to his public character and usefulness in the office. We are unable to distinguish between the two cases in principle.'
 
 
 13
 To permit this salutary rule relating to public officers to be thrown out the window by a mere allegation that the act was done pursuant to a conspiracy with others and a design to harm plaintiff, would frustrate all the purposes of such a rule as outlined by Judge Hand in the Gregoire case, supra. It would fly in the face of what this court has held in other comparable cases. See Harmon v. Superior Court, 9 Cir., 329 F.2d 154 and Agnew v. Moody, 9 Cir., 330 F.2d 868, 869, in each of which a 'conspiracy' was alleged.[3] As Judge Hand indicated, the justification for the rule is that it is impossible to know before trial whether the claim is well founded and that officials should not be put to the burden of a trial because such a rule would 'dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.'
 
 
 14
 In this connection the Fifth Circuit case of Norton v. McShane, supra, is a useful and helpful one. It discusses the history of absolute immunity which began with cases involving judges and then was extended to minor government employees as noted in Barr v. Matteo, supra, Most of the cases cited in footnote 5 of that case, (see footnote 2, supra), are common law wrongs but there is no reason why the same rule should not apply here to a statutory wrong.[4] This is apparent from Cahn v. International Ladies' Garment Union, 3 Cir., 311 F.2d 113, where the rule of immunity was applied to an officer sought to be charged under the antitrust law.
 
 II
 
 15
 There is another reason why the order of the district court must be affirmed. The motion before the court is in the alternative: for a dismissal pursuant to Rule 12 and in the alternative for summary judgment. The order of the court notes the alternative character of the motion and orders that the amended complaint 'is dismissed with prejudice' against the two defendants, appellees here.
 
 
 16
 The court had before it affidavits and depositions. This necesstated the situation mentioned in Rule 12(b) as follows: 'If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.' Under that Rule the motion must be treated as one for summary judgment when the matters outside the pleading are 'not excluded by the court.'
 
 
 17
 Nothing in the court's order dismissing the complaint with prejudice suggests that the court was excluding anything. The trial Judge filed no opinion and he had no occasion therefore to discuss all the bases for his ruling. For all that appears here he may well have said in an opinion, had he written one, that he based his ruling not only on the decision in Barr v. Matteo, supra, but upon facts set forth in the affidavits and depositions as well. Precisely in point here is Suckow Borax Mines Consol. v. Borax Consolidated, 9 Cir., 185 F.2d 196, 205, where we noted that Rule 12(b) 'requires a motion to dismiss (for failure to state a claim) to be treated as a motion for summary judgment if matters outside the pleadings are presented to, and are not excluded by, the court.'
 
 
 18
 Rule 56 relating to summary judgments recites as follows: 'When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.' There was no valid response to defendants' showing in support of their motion for summary judgment.
 
 
 19
 What demonstrates conclusively that the Judge was basing his ruling upon all grounds presented by the motion and by the affidavits is the fact that he dismissed with prejudice. If the motion to dismiss alone were being sustained, the normal procedure would be to sustain the motion with leave to amend.
 
 
 20
 Even if we were to assume, contrary to the facts here, that the court wrote an opinion saying 'I base my opinion solely upon the insufficiency of the complaint and I exclude all matters connected with the motion for summary judgment' we should affirm. 'In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.' Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224.[5] Here the affidavits and the depositions are in the record. They are not contradicted and since no counter showing was made as required by Rule 56(e) we who can read the affidavits and depositions as well as anybody are in a position to follow the mandate contained in the last sentence of Rule 56(e). The whole case is before us and as stated in the last footnote, supra, it would be 'wasteful' to remand for the consideration of the summary judgment motion.
 
 
 21
 If, as stated in Suckow Borax Mines Consol. v. Borax Consolidated, supra, we were to reject the argument that the complaint states no claim, we are required to treat the motion as a motion for summary judgment. An examination of the affidavits and depositions upon which the motion for summary judgment was based discloses that the facts are clear and uncontradicted. They are as follows:
 
 
 22
 (1) The call for bids on the timber in question, as required by the regulations, recited 'The right to reject any and all bids is reserved.' The applicable regulations (36 C.F.R. Sec. 221.10) provide for rejection of all bids as follows: '(a) Advertised timber will be awarded to the highest bidder upon satisfactory showing by him of ability to meet financial requirements and any other conditions of the sale offer unless: (1) Determination is made to reject all bids. * * * (c) If the highest bid is not accepted and the sale is still deemed desirable, all bids may be rejected and the timber readvertised.' Here the Forest Service also had utilized what is referred to as a 'Handbook' (apparently not a public document) which directed that where a sale includes minor quantities of certain species 'It is desirable to advertise the minor species or the deteriorating species at a fixed rate.'
 
 
 23
 (2) When this sale was advertised, for some reason a minor species, cedar, was not offered at a fixed rate in accordance with the Handbook. When these bids were received S & S Logging bid for the cedar $107.10 per thousand (as compared with $4.60 per M for Douglas Fir and $2.30 per M for Hemlock and others.)
 
 
 24
 (3) The Handbook provided that rejection of all bids would require the action of 'higher authority'.
 
 
 25
 (4) This higher authority was Assistant Regional Forester for Region 6 U.S. Forest Service, Walter H. Lund. His deposition is a part of the record and he tells precisely how and why it happened that he himself made the determination to reject all bids. He testified that 'the initial suggestion that we might want to reject all bids came from me.' He suggested to the defendants Benecke and Chriswell that they consider whether 'we should respect all bids'. He testified that the bid was an unrealistic bid; that when he learned about the $107 bid 'I immediately thought that there is something funny here.' He referred to the policy of having minor species like this advertised at a fixed rate and said 'I think one of my earliest thoughts in this case was 'My Lord, why didn't the Forest advertise those at a fixed rate at the beginning and avoid this sort of thing?" This witness testified that he did not consider objections or complaints in connection with this sale or the bids. 'I thought it was a bad thing myself.' He had heard of some complaints 'but I did not think that was until after I had already taken my initial action.' Lund had information that people were 'bidding upon cedar and then with the idea of destroying part of it by felling it across stumps, and so forth, as you can do if they are intent on destroying cedar because it breaks rather readily.' This witness explained at some length why an excessive bid on a minor species, as in this case, is unrealistic and gives rise to suspicions of irregularity. The witness described what prompted his action as follows: 'I don't know what the bidder had in mind-- but the thought immediately occurred to me that there has to be either one of two things: either that the cruise is inaccurate or that there is substantially less cedar there than the estimate indicated, or he has some design of destroying part of the cedar or hiding it someway that he would not pay for it. Now, those would be the two things which would ordinarily cause somebody to bid the way the bidding went on this first sale. There would be no other logical reason for it.'
 
 
 26
 (5) After Lund had written to Chriswell, as indicated above, he received the latter's recommendation in accordance with his own recommendation agreeing that cedar should be advertised at a fixed rate and that it would be to the Government's best interest to reject all bids and readvertise the sale and also agreeing that the price for cedar was completely unreasonable and could lead to serious losses. Lund then made this decision advising Chriswell exactly how to notify the plaintiff of the rejection of all bids.
 
 
 27
 It is perfectly obvious that what the Forest Service officials did was to exercise the reserved right to reject all bids in circumstances which suggested that the bids were unrealistic and calculated to give an opportunity to cause loss to the Government. There is not a particle of proof to contradict this showing of the defendants.
 
 
 28
 The only affidavit that was filed on behalf of the plaintiff was that of the attorney for the plaintiff who quoted from the Forest Service Handbook mentioned above. The affidavit was devoted solely to an effort to show that the rejection of all bids was not within the authority or discretion of the Forest Service officials. The key to that affidavit is found in the following sentence: 'It will be noticed that there is no provision to reject bids on claimed grounds on which the plaintiff's original highest bid was rejected.' It is perfectly plain that at the time this matter was first presented to the trial court plaintiff was simply taking the position that the defendants had taken action rejecting all bids under circumstances which were not specified in the regulations as a basis for such action. Obviously plaintiff cannot maintain that position, first, because under the regulations there is no limitation on the unqualified discretion of the Forest Service to reject all bids with or without reason;[6] and second, the action in rejecting all bids was the action of Lund and not that of these two defendants or either of them.[7]
 
 
 29
 Another fatal flaw in plaintiff's case is that there is a complete lack of anything to show that the plaintiff would not be a bidder at the readvertised sale or that the defendants had any reason to suspect it would not be bidding then. The depositions of Chriswell and of Benecke show positively that they both thought that plaintiff would attend and bid on the second sale. As stated by Chriswell: 'We thought Mr. Schuett (representing plaintiff) would be at the sale, and I think that Mr. Benecke attended that sale and he was rather surprised that Mr. Schuett was not there.' Benecke testified that persons had inquired whether plaintiff was going to be permitted to bid at the second sale and 'I advised them he certainly would be permitted to bid.'
 
 
 30
 In fact, the record shows that the Forest officials gave every consideration in an effort to work out a plan which would permit plaintiff to get the timber. The deposition of Lund shows that plaintiff's attorney discussed the matter with him after the bids had been rejected and Lund discussed the attorney's suggestion then made as follows: '* * * part of what you suggested was that you felt that your client would agree to pay for the estimated volume of cedar as a condition of our making the award to him, and I said, 'Well now, have you gotten your client to say that?' And you said, 'No.' I said, 'Well, it would be very ' To me that was very unusual, and I think I expressed the opinion that he probably would not agree to that. And your reply was, 'Well, if he won't agree to it, why, I am through with him. Then I would agree you have a right to be suspicious."
 
 
 31
 Chriswell, after plaintiff's attorney had then gone to him and discussed the possibility of reconsidering the cancellation of the bids and letting plaintiff get the timber, testified that he and the attorney were discussing the latter's suggestion that they find the basis for reopening and reconsidering the matter but plaintiff never came forward with any acceptable proposal. 'You suggested that Mr. Schuett might deposit the total amount of the value of the cedar before logging, and we said that we thought that would be acceptable, and Mr. Schuett stated that it was too much of a risk to do that.'
 
 
 32
 It is plain from the record that both parties contemplated that the court on this appeal would deal not merely with the sufficiency of the complaint but would pass upon the sufficiency of the showing in support of a summary judgment. Thus, on February 1, 1965, the appellant filed its designation of the contents of the record on appeal. In this designation are included requests for certification of the affidavits of Benecke, Chriswell, and Lund, and the affidavit of Hoseph T. Pemberton, who was attorney for plaintiff and who made the affidavit above referred to. These and other papers were specified to become a part of the record on appeal.
 
 
 33
 The defendants then made corss-designation calling for inclusion of four depositions as well as interrogatories and answers to interrogatories. Most of these matters would have been left out of the record here were it not that the parties contemplated that we would pass upon the motion for summary judgment.[8]
 
 
 34
 We hold that for both of the reasons herein stated: the insufficiency of the complaint, and the demonstrated right to a summary judgment, the decision below must be affirmed.
 
 
 35
 It is so ordered.
 
 MERRILL, Circuit Judge (concurring):
 
 36
 I concur upon the ground that the record supports summary judgment. I dissent from the holding that under Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335 (1958), dismissal of the action was proper.
 
 
 37
 Barr v. Matteo dealt with 'the law of privilege as a defense by officers of government to civil damage suits for defamation and kindred torts.' 360 U.S. at 569, 79 S.Ct. at 1338. The application of official privilege to other torts has been based largely upon the rationale of Gregoire v.Biddle, 177 F.2d 579 (2nd Cir. 1949), as quoted with approval in Barr v. Matteo.
 
 
 38
 I cannot agree with the majority that the Gregoire rule is a 'salutary' one. It operates to deprive a plaintiff of redress for torts actually and maliciously committed. This unjust result is, in Gregoire, apologetically swallowed as the lesser of two evils for the reason that otherwise the zeal of federal officers in carrying out their official duties would be impaired. Cf. Prosser on Torts, pp. 803, 1014-18 (3rd ed. 1964), and comments there cited.
 
 
 39
 This result I am prepared to accept (although with some misgivings as to whether, in the seventeen years since Gregoire, some more just legislative or administrative solution of the problem might not have been found). If the conduct complained of here were confined to the performance of the official acts to which the majority opinion refers, I would have no quarrel. Nor would I feel the situation to be altered by an allegation that those acts were maliciously performed; nor by an allegation that these appellees had conspired with each other to perform those acts. As the majority points out, this is no more than an allegation of multiparty malice. But this not such a case.
 
 
 40
 Here a Sherman Act conspiracy is alleged involving not only these appellees but competitors of appellant in the lumber business and a banking corporation. The complaint prays in part:
 
 
 41
 'That the Court adjudge and decree that the defendant have combined and conspired to restrain unreasonably and have conspired to monopolize, attempted to monopolize and have monopolized interstate trade and commerce in the sale of an important national commodity, to-wit: U.S. Forest Service timber in violation of Sections 1 and 2 of the Sherman Act.'
 
 
 42
 The conspiracy here, then, was more than one to perform certain official acts for an improper purpose. It was one to monopolize in violation of the Sherman Act. As such, it had an independent significance apart from overt acts performed pursuant to it. To establish it requires more than inference that certain official acts were maliciously performed. An unlawful combination and agreement between the officers and outsiders must be proved-- conduct clearly beyond the perimeter of official duty.[1]
 
 
 43
 The majority thus extends the Gregoire rule to cover an unlawful conspiracy to monopolize simply because overt acts crucial to its success fell within the outer limits of official authority.
 
 
 44
 The rule so extended does not to me make a valid judgment as to which is the lesser of two evils. The extent to which Congress has gone in proscription of such agreements seems to me to lend support to my view.
 
 
 
 [1]
 That case was not one of the type we have here, but the Court cites Barr v. Matteo and Gregoire v. Biddle, supra, as illustrative of a sound principle dealing with what it called 'an absolute privilege.'
 
 
 [2]
 'The federal courts have applied the doctrine of official immunity to suits against numerous officials for many different torts.' Norton v. McShane, 5 Cir., 332 F.2d 855, 859. Footnote 5 in that opinion contains an extensive list of administrative officers who have been held immune from suit. In Robichaud v. Ronan, 9 Cir., 351 F.2d 533, this court held that a prosecuting attorney who acted, not as such, but as a policeman, was not immune from suit under the Civil Rights Acts. As that suit arose under those Acts (42 U.S.C. Secs. 1983, 1988, and 28 U.S.C. 1343) the case is not in point here. In its general discussion of the immunity rule, the court assumed that the immunity was related to acts 'committed by the officer in the performance of an integral part of the judicial process.' This apparent assumption that the immunity is so limited was unnecessary to that decision, and it must have been inadvertent for it is plainly contrary to the statements quoted above from Barr v. Matteo and O'Campo v. Hardisty and contrary to the other cases listed in Norton v. McShane, supra
 
 
 [3]
 'Appellant argues that 'the doctrine of judicial immunity is never a valid defense as to a charged conspiracy, since taking part in a conspiracy is outside of the judicial function.' But conspiracy was alleged in Harmon v. Superior Court, 329 F.2d 154, * * *. And although conspiracy is an essential element of the offense under 42 U.S.C.A. Sec. 1985, the doctrine of immunity nonetheless applies to actions under that section.'
 
 
 [4]
 In Bauers, Jr. v. Heisel, Jr., 3 Cir., 361 F.2d 581 (May 19, 1966) the officer's immunity was upheld in a statutory suit under the Civil Rights Act. Many similar decisions are collected in footnote 7 to that opinion
 
 
 [5]
 'It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate.' Securities and Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626
 
 
 [6]
 If appellant were right in its assertion that the rejection of all bids was unauthorized by law or by rule, its remedy would be by action for review of an administrative order under Sec. 10 of the Administrative Procedure, Act (5 U.S.C. Sec. 1009). However, it is plain that the agency action here taken was one 'committed to agency discretion' within the meaning of the exception stated in the first sentence of that section
 
 
 [7]
 In addition to the affidavit thus described. the plaintiff through one of its officers filed answers to certain interrogatories propounded by these defendants. Rule 56 provides that a summary judgment may be based upon answers to interrogatories and affidvits may be opposed by answers to interrogatories. The answers thus made by the plaintiff to defendants' interrogatories are wholly insufficient to counteract or contradict the facts shown on behalf of the defendants. In the first place these answers are in substance no moer than a bill of particulars of the allegations of the complaint. Like the affidavit they are devoted mainly to a futile effort to challenge the authority of the Forest Service officials to reject all bids. The statements are self-serving and taken by themselves would be inadmissible in evidence. (The typical case of proper use of answers to interrogatories is American Airlines v. Ulen, 87 U.S.App.D.C. 307, 186 F.2d 529, where the court sustained plaintiff's motion for a summary judgment on the basis of defendants' answers to interrogatories. There, of course, the answers were in the nature of admissions by the opposing party.)
 The main reason why these answers are completely insufficient here is that they failed to conform to the requirements of subdivision (e) of Rule 56 which provides that supporting and opposing affidavits 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' The answers here in question were sworn to but are wholly insufficient because there is a complete failure to show that the person answering had personal knowledge or was competent to testify to any of the matters stated. In substance the answers were no different than the answer to Question No. 7, as follows: '7. State with whom, when and how the defendants, Chriswell and Benecke, participated in the conspiracy to prevent any oral bids at the second Green Mountain sale. Answer. It is believed that Chriswell and Benecke were doing the bidding of Summit Timber Company, Eclipse Timber Company and defendants, Barker, Bob Jones and Ivan Jones, commencing with the time that the Eclipse Timber Company was the second high bidder at the first Green Mountain sale.' Directly in point is State of Maryland for the Use of Barresi v. Hatch (D.C.Conn.), 198 F.Supp. 1, 2-3.
 
 
 [8]
 It is apparent from one of the answers to the interrogatories made by the plaintiff that there were also counter-interrogatories propounded to Chriswell and answers by him. The fact that neither party asked that these answers by Chriswell be incorporated in this record sufficiently indicates that neither party thought they would be of any importance or significance in connection with a review of the ruling on the motion for summary judgment. To verify that conclusion, we requested the Clerk to obtain from the Clerk of the district court the original interrogatories to Chriswell and his answers thereto. They are now in the custody of the Clerk of this court. A reference to them shows that they have no significance, one way or another, with respect to the matters here discussed
 
 
 [1]
 The independent significance of the conspiracy seems pointed up here by the fact that it may still be proved as to the outsaiders. The judgment of dismissal did not apply to them. Appellees may still be inconvenienced and embarrassed by a call to testify. To hold Gregoire applicable under these circumstances would serve to immunize public officers from the consequences of Sherman Act violations actually proved against them