Gloria KING, Plaintiff,

v.

Gail NORTON, Secretary of the Interior, and United States Department of the Interior, Bureau of Indian Affairs, Defendants.

No. 00–CV–10006–BC.

United States District Court, E.D. Michigan, Northern Division.

Aug. 29, 2001.

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

This case comes before the Court on the complaint by Gloria King, a spokesperson for a group of petitioners attempting to amend the constitution of the Saginaw Chippewa Indian Tribe of Michigan. The plaintiff seeks review of a ruling by the Secretary of the Interior, Bureau of Indian Affairs disallowing a petition to amend the Tribal Constitution because the requisite number of signatures was not affixed. The Agency initially approved the petition calling for the election, but later, upon reconsideration, reversed its ruling and determined that the petition was insufficient to require the Secretary to call the election. The parties have filed cross motions for summary judgment and the Court heard oral argument from the parties through their respective counsel in open court. Because the Court finds that the manner in which the Bureau of Indian

Affairs (BIA) calculated the requisite number of valid signatures was contrary to law and constituted an abuse of discretion, and that the petitioners in fact gathered the required signatures, the Court will grant the plaintiff's motion for summary judgment and order the Agency to call and hold the election.

### I.

The Saginaw Chippewa Indian Tribe of Michigan (Tribe) is an Indian entity that is reorganized under the Indian Reorganization Act (IRA), 25 U.S.C. §§ 476–79, and has adopted a constitution pursuant to federal statute. As such, it is considered a "reorganized tribe." *See* 25 C.F.R. § 82.1(*l*).

Sometime prior to June 1997, a group of individuals launched an effort to amend Article III of the Saginaw Chippewa Indian Tribe's Constitution in order to substantially broaden the membership of the Tribe. Article VII of the Tribe's Constitution sets forth a process by which the constitution may be amended. It provides, in relevant part, "It shall be the duty of the Secretary of the Interior to call an election on any proposed amendment upon receipt of a petition signed by one-third of the resident qualified voters in each of the three voting districts."

Before initiating the petition process, plaintiff contacted the Bureau of Indian Affairs unit office in Michigan in November 1998 requesting that the BIA inform her of the number of signatures of eligible voters that she would need to gather for a valid petition. Anne Bolton, the superintendent of the agency, first contacted the Tribal Clerk's office for the number of tribal members who would be 18 years old by the cut-off date of December 31, 1998. Thereafter, Ms. Bolton determined that District 1 would have 518 eligible voters, District 2 would have 47 eligible voters, and District 3 would have 1,373 eligible voters. Although Ms. Bolton equivocated as to the accuracy of her count, on November 23, 1998 she sent a letter to the plaintiff stating that 173 signatures were needed from District 1, 16 from District 2, and 458 from District 3.[1] The figures certified by Ms. Bolton were based upon a cut-off date of December 31, 1998.

On July 15, 1999, plaintiff submitted her petition to the BIA, who sent the petition to Area Director, Larry Morrin, on September 2, 1999. In a September 22, 1999 letter, Morrin acknowledged that applicable regulations required that the BIA thereafter forward the petition to him within 30 days (August 14, 1999) and that the Area Director make a decision on the sufficiency of the petition within 45 days (August 29, 1999). Nevertheless, the Assistant Secretary Indian Affairs had granted the BIA an extension for it to forward the petition no later than September 7 and for the Area Director to make a decision by September 22, 1999. The reasons Mor-

---

1. In her letter, Ms. Bolton stated:
   We recently received information indicating that the enrollment consultant (James Mills, DCI) hired by the Tribal Council has not yet completed the process of reviewing the tribe's enrollment files. The Tribal Council, under order of the Tribal Court, was ordered to resolve the enrollment problems to assure that only qualified candidates and voters would participate in the yet to be held tribal election. **We recommend that before taking any action to start the peti-** **tioning process to amend the Tribal Constitution, that the current enrollment issue be resolved in accordance with the current Tribal Constitution and procedures in enrollment Ordinance 14.** If they are not, it is likely that the Secretarial Election process will be hampered by the same membership issues that have affected the last several tribal elections.
   A.R. at 533, Letter from BIA Superintendent to Gloria King, Nov. 23, 1998 (emphasis in original).

rin cited for requesting the extension were as follows:

1. On July 20, the Agency requested an alphabetical list of tribal members, as well as a list of members who were 18 years of age as of December 31, 1998, and sorted by their district of residence, containing a full name, address, date of birth and enrollment number. On August 2, 1999, Robert Lyttle submitted a list of "tribal member voters" with a district number noted in a column by each name, however, no birth dates or addresses were included. The Tribe did not provide the membership information needed to verify the signatures on the petition until August 6, 1999.

2. The Tribal Council passed the Redistricting Act of 1999 [on March 11, 1999] after the first signatures were taken on the petition, changing the boundaries of the Isabella District and therefore changing the number of signatures need [sic] for that District and District 3.

3. We are waiting for an opinion from the Field Solicitor as to which district boundaries we must use for our review.

A.R. at 84–85, Letter from Area Director Morrin to Gloria King, Sept. 22, 1999.

The Field Solicitor issued an opinion on August 11, 1999 that the voting districts in place at the commencement of the petitioning process should be used by the BIA for its evaluation. The Tribe then furnished another list of voters on August 23, 1999 sorted according to the original district boundaries. Based on the August 1999 list, the BIA determined that there were 634 qualified voters in District 1, 42 in District 2, and 1,385 in District 3. This census was different than the one certified by Superintendent Bolton in November 1998. The Area Director thus concluded

that the plaintiff needed to collect 211 signatures from District 1, 14 from District 2, and 462 from District 3. After deducting from the petition duplicate signatures, individuals not listed on the August 23 roll, names in which there was no signature accompanying the printed name, names in which the collector could not be identified as an eligible voter, and signatures without corresponding printed names, Area Director Morrin stated in a September 22, 1999 letter that the 211 signatures gathered from District 1, 20 from District 2, and 549 from District 3 were sufficient. A.R. at 85.

Two days later, on September 24, 1999, the Tribal Council requested that Morrin reconsider his decision. The Tribal Council argued that one-third of 634 is 211.33 and that therefore 212 signatures were needed from District 1. A subsequent elaboration of the arguments in favor of reconsideration was sent to Morrin on September 29, 1999. Thereafter, on October 20, 1999, Shirley VanAstine, an Acting Regional Director of the BIA, granted the Tribal Council's request for reconsideration and rescinded the BIA's decision that the petitioners had submitted a sufficient number of signatures. She based her recommendation on the September 30, 1999 decision in *Ransom v. Babbitt*, 69 F.Supp.2d 141 (D.D.C.1999). In that case, the tribe's constitution required a vote of 51% of the tribe to ratify any constitutional amendments. In the referendum at issue, 50.935093% of the tribe voted to ratify the constitutional amendment. The Court found that the percentage was insufficient and that the BIA had acted unreasonably in finding otherwise. *Id.* at 151–52.

In her October 20, 1999 letter, Acting Regional Director VanAstine invited interested parties to submit legal arguments and any new materials on the question of whether *Ransom* should be adopted in this

case. After receiving the parties' responses, Morrin issued a December 28, 1999 decision that the petition lacked the number of signatures necessary to call a secretarial election. Although Morrin relied primarily on the *Ransom* case, he also cited an October 6, 1999 Tribal Council resolution in which it was stated that for the purposes of interpreting Article VII of the Constitution,

> [W]hen the number of resident qualified voters in a district is such that exactly one-third is numerically impossible, then the number of voters who must sign shall be that number which equals the next higher number that is at least one-third of the voters in that district.

Morrin stated that there were numerous cases that required the BIA to defer to tribal interpretations of Constitutional language. A.R. at 3.

After the December 28, 1999 final decision, plaintiff filed suit in this Court seeking review of the BIA's decision and requesting a writ of mandamus. On June 14, 2000, this Court's predecessor, the Honorable Victoria A. Roberts, heard oral argument from the parties through their counsel and denied the motion for a writ of mandamus on the record. The Court further directed that the matter proceed to a review of the validity of the BIA's determination in accordance with the Administrative Procedures Act, 5 U.S.C. § 706. The Court entered an order denying the motion for writ of mandamus on June 16, 2000. Thereafter, the parties filed cross-motions for summary judgment on the administrative record in accordance with the schedule established by Judge Roberts, and this Court subsequently entertained oral argument by counsel for the parties in open court.

## II.

Review of actions by an administrative agency is generally conducted under the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* According to section 706 of the Act, a federal court must "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).[2] *See GTE Midwest, Inc. v. Fed. Communications Comm'n,* 233 F.3d 341, 344 (6th Cir.2000). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S.

---

**2.** Section 706 of the Administration Procedures Act, 5 U.S.C. § 706, states:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

  (B) contrary to constitutional right, power, privilege, or immunity;

  (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

  (D) without observance of procedure required by law;

  (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

  (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Even though the analysis is deferential to the agency, the agency nonetheless must articulate a "rational connection between the facts found and the choice made." *Id.* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

■ An abuse of discretion is found when, based on the evidence, the explanation offered for a particular outcome is unreasonable. *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442,* 64 F.3d 238, 242 (6th Cir.1995).

■ An agency ruling that is contrary to law likewise must be set aside. A court may invalidate an agency adjudication or rule making if it is "inconsistent with the statutory mandate or frustrate[s] the policy that Congress sought to implement." *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1350 (6th Cir.1994). "An agency which violates its regulations is acting contrary to law...." *Chrysler Corp., v. Schlesinger,* 412 F.Supp. 171, 177 (D.Del.1976), *vacated on other grounds sub nom Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *S & S Logging Co. v. Barker,* 366 F.2d 617, 624 n. 6 (9th Cir. 1966); *Delaware v. Bender,* 370 F.Supp. 1193, 1203 (D.Del.1974).

The parties in the present case have filed cross-motions for summary judgment. The Court of Appeals for the Sixth Circuit has suggested, without deciding, that the use of summary judgment procedures is inappropriate for judicial review of an administrative action under the Administrative Procedures Act. *See Alexander v. Merit Sys. Prot. Bd.,* 165 F.3d 474, 480 (6th Cir.1999). The Tenth Circuit has held that a motion for summary judgment is an inappropriate procedural device to review administrative decisions because it invites the district court to rely on evidence outside the administrative record. *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560,

1579–80 (10th Cir.1994). In that case, the Court stated that the district court is not exclusively a trial court but sometimes acts as an appellate court. It reasoned that since motions for summary judgment are "conceptually incompatible with the very nature and purpose of an appeal," the district court should be governed by the Federal Rules of Appellate Procedure. *Id.* at 1580.

In this case, the defendants argue that this Court should confine its inquiry to the administrative record. Although supplementation of the administrative record is appropriate in some cases, *see Sierra Club v. Slater,* 120 F.3d 623, 638 (6th Cir.1997), the Court finds that it is neither necessary nor appropriate to consider affidavits outside of the administrative record or any information that was not available to the administrative decision makers in this case.

### III.

■ Plaintiff's first contention is that the BIA did not have the authority to reconsider its September 22, 1999 letter-decision finding that the number of valid signatures gathered was sufficient to require the election. In her Motion for Writ of Mandamus and Injunctive Relief, the plaintiff argued that the agency had no express statutory or regulatory authority to revisit a decision once it was made. The plaintiff has not renewed that argument in her summary judgment papers, but the Court will address it because plaintiff has not clearly abandoned that position and the defendants have briefed the issue. The defendants have not identified any express authorization permitting reconsideration of a decision by the Department of the Interior of the sufficiency of a petition for a Secretarial election as described in 25 C.F.R. Part 82. However, the Court of Appeals for the Sixth Circuit has held that

"[t]he Secretary of the Interior has the inherent authority to reconsider an earlier agency decision." *Belville Mining Co. v. United States,* 999 F.2d 989, 997 (6th Cir. 1993).

> Even where there is no express reconsideration authority for an agency, however, the general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision.

*Id.*

The *Belville Mining* Court held that "certain limitations" circumscribed the agency's reconsideration authority, such as timeliness of the reconsideration decision, legitimacy of the motive for reconsideration (an agency may not use "the power to correct inadvertent errors ... as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in light of changing policies"), and, in some cases, absence of detrimental reliance by the parties. *Id.* at 998–99. However, none of those limitations prevented the BIA's reconsideration decision in this case.

■  The decision to reconsider the sufficiency of the petition signatures was announced on October 20, 1999, twenty-eight days after the initial decision. In *Belville Mining,* the Court stated that a reconsideration would be considered timely if it "is conducted within a short and reasonable time period." *Id.* at 1000 (citing *Bookman v. United States,* 197 Ct.Cl. 108, 453 F.2d 1263, 1265 (1972)). Although the determination of "short and reasonable" is necessarily case-specific, "absent unusual circumstances, the time-period would be measured in weeks, not years." *Gratehouse v. United States,* 206 Ct.Cl. 288, 512 F.2d 1104, 1109 (1975). The *Belville Mining* Court upheld an agency reconsideration that occurred eight months after the initial decision. Under any reasonable measure, the 28–day period in this case is a "short and reasonable" time for reconsideration of the decision initially announced in September 1999.

The parties have not argued, and the record does not suggest, that the decision to reconsider was motivated by a policy change within the agency. Rather, it is apparent that the Area Director was endeavoring to respond to the legitimate argument made by the Tribal Council that the number of qualified signatures in District 1—211—did not equal one-third of the resident qualified voters in that district. Furthermore, the Area Director was presented with an opinion from a federal district court that called into question his method of determining the numerical sufficiency of the petitions. Reconsideration was motivated by the desire to determine whether errors were made in concluding that the petitions met the Tribal Constitution's requirement and, if so, to correct those errors.

Finally, according to the *Belville Mining* decision, detrimental reliance by a party will not prevent an agency's reconsideration of a decision if the initial decision is in fact erroneous. 999 F.2d at 999. In this case, the BIA ultimately concluded that 211 (the number of valid signatures) is less than one-third of 634 (the number of qualified voters ultimately found to be in District 1), and that therefore the agency must "round up" fractional number calculations to the next whole number when determining whether enough valid signatures were collected. This decision, supported by *Ransom v. Babbitt, supra,* is correct as a matter of both law and arithmetic. The initial decision that 211 was at least one-third of 634 was clearly in error. Consequently, even if the plaintiff detrimentally relied on the Agency's September 22, 1999 decision, reconsideration was proper.

None of the limitations identified by the *Belville Mining* Court precluded reconsideration by the BIA of its initial determination that the petitions were sufficient. The Agency did not act beyond the scope of its authority when it reconsidered and reversed its earlier decision.

## IV.

The plaintiff also argues that the determination that there was an insufficient number of signatures from District 1 resident qualified voters was arbitrary and capricious, an abuse of discretion, and contrary to law for two principal reasons. First, plaintiff contends that defendants improperly determined the total number of resident qualified voters in the district because the Agency should have been required to use the number certified to plaintiff in the Agency's November 23, 1998 letter. Second, plaintiff claims that the Agency was wrong in disqualifying several of the signatures that were submitted with the petitions in July 1999.

## A.

Turning to the first argument, it is the plaintiff's belief that the Secretary's rules require the Agency to fix the number of petition signatures required by the Tribal Constitution and, upon request of the petitioners' spokesperson, give notice of that number. Plaintiff contends that the Agency may not thereafter alter the required number of signatures, both because the rules prohibit it and due to the plaintiff's detrimental reliance on it. Increasing the number of required signatures after the "cut-off date," and especially after the petitions were submitted, plaintiff argues, amounts to changing the rules of the game after it begins and is fundamentally unfair.

The defendants respond that plaintiff's argument is based essentially on an estoppel theory, and that mere detrimental reliance is insufficient to establish an estoppel against the government. Rather, defendants argue, the plaintiff must also show that the government engaged in affirmative misconduct, an element that is absent in this case. The defendants also assert that the plaintiff has misinterpreted the administrative rules dealing with determining the sufficiency of petitions calling for Secretarial elections, and that the agency has fully complied with the rules.

■ This aspect of the dispute implicates the division of responsibility between the tribal government and the federal government in the process of adopting and amending tribal constitutions. The Supreme Court has held that the right to self-government is fundamental to tribal existence as a domestic independent nation. *See White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142–45, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Congress has the power to "regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes." U.S. Const. art. I, § 8. *See Ransom,* 69 F.Supp.2d at 149. The Indian Reorganization Act was passed by Congress in 1934 to "establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari,* 417 U.S. 535, 542, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

Congress has delegated to the Secretary of the Interior certain duties in the regulation of tribal governments, including the power to call and oversee tribal elections in which tribal constitutions are to be adopted or amended. *See* 25 U.S.C. §§ 476–479. When the Secretary receives a request for such an election, she must call for it within 90 days. 25 U.S.C. § 476(c)(1)(B). However, the manner in which requests for such elections may be made is left to tribal determination.

The Secretary shall authorize the calling of an election on the adoption of amend-

ments to a constitution and bylaws or a charter when requested pursuant the amendment article of those documents. The election shall be conducted as prescribed in this part unless the amendment article of the constitution and bylaws or the charter provides otherwise, in which case the provisions of those documents shall rule where applicable. 25 C.F.R. § 81.5(d).

■ Elections to amend tribal constitutions must be conducted pursuant to the rules prescribed by the Secretary of the Interior and are therefore known as "Secretarial elections." *See* 25 C.F.R. § 82.1(m). They are not conducted under tribal authority, but rather they are federal elections. *See Cheyenne River Sioux Tribe v. Andrus,* 566 F.2d 1085, 1088 (8th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978).

> It bears emphasizing that Secretarial elections, such as the one at issue here, are federal—not tribal—elections. 25 C.F.R. § 81.1(s). Tribes are sovereign only to the extent that their sovereignty has not been qualified by statute or treaties. *Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 14 [107 S.Ct. 971, 94 L.Ed.2d 10] (1987). *The IRA explicitly reserves to the federal government the power to hold and approve the elections that adopt or alter tribal constitutions.* 25 U.S.C. § 476.

*Thomas v. United States,* 189 F.3d 662, 667 (7th Cir.1999)(emphasis added).

According to the Tribal Constitution of the Saginaw Chippewa Indian Tribe of Michigan, elections to amend the constitution may be initiated only by petition. The Secretary has prescribed rules intended "to provide uniformity and order in the formulation and submission of petitions requesting the Secretary ... to call elections to amend tribal constitutions...." 25 C.F.R. § 82.2. Those rules are contained in 25 C.F.R. Part 82.

The responsibility for determining the number of valid signatures which must be gathered to call for a secretarial election clearly falls upon the BIA. The Secretary's rules state: "The numerical sufficiency of any petition submitted pursuant to this part shall be based upon a number determined by the local Bureau official...."[3] 25 C.F.R. § 82.5(a). The rule directs the local Bureau official to consult with the tribal government in making this determination, and in the case of reorganized tribes, such as the Saginaw Chippewa Tribe here, the local Bureau official must determine the number of members over 18 years old and "eligible to register for a Secretarial election." *Id.* But the final determination of the number of signatures that would be required is left exclusively to the agency official.

■ The Secretary's rules also require the Agency to inform the petitioners of the number so determined, and to establish a cut-off date "when, for the purpose of the petition, no further names will be added." 25 C.F.R. § 82.5(b).[4] In this case, the Superintendent of the BIA office established a cut-off date of December 31, 1998. Compl. App. D, Nov. 24, 1998 Letter From Superintendent Bolton to Gloria King. The defendants argue that this date actually represented the final date when petition signatures may be collected. In fact, the defendants contend that plaintiff

---

**3.** "Local Bureau Official" is defined as "the Superintendent, Field Representative, or other line officer of the Bureau of Indian Affairs who has local administrative jurisdiction over the tribe concerned." 25 C.F.R. § 82.1(h).

**4.** The full text of 25 C.F.R. § 82.5(b) states:
"The number shall be made available to the spokesman to the petitioners upon request along with a cut-off date when, for purposes of the petition, no further names will be added."

cannot reasonably rely on the Superintendent's determination in her November 28, 1998 letter because the defendant had not collected a single signature by the cut-off date.[5] Because of their view of the meaning of this rule, the defendants do not address the consequences of the Agency's action of increasing the required number of signatures after the petitions were submitted in July 1999.

Although this Court gives deference to an agency's interpretation of its own rules, *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943–44 (6th Cir.2000), it does not appear that any Bureau official viewed the cut-off date referred to 25 C.F.R. § 82.5(b) as a deadline for filing petition signatures. Otherwise, plaintiff's July 1999 filing would have been rejected out of hand. Moreover, the interpretation which the defendants' attorney urges on this Court is not reasonable in the context of the other rules established for regulating the petition process.

Section 82.5 is a rule prescribing the manner of determining the minimum number of petition signatures that will be required, and to require the Bureau official to inform petitioner of their target number. To ensure that petitioners will not be aiming at a moving target—in other words, "to provide uniformity and order" in the process, § 82.2—the rules requires that the target number be fixed as of a certain date—the "cut-off date." After that date, "no further names will be added" to the list of eligible voters for the purpose of determining the numerical sufficiency of the petition.

Accepting the defendant's argument that the meaning of "cut-off date" in § 82.5(b) is the date after which no further petition signatures would be collected would render meaningless another rule which regulates that very issue. Section 82.8 deals with filing petitions, and states in part:

> All petitions submitted pursuant to this part must be filed with the local Bureau official having administrative jurisdiction over the tribe. No petitions will be accepted until the spokesman for the petitioners declares that he/she wishes to make an official filing. Once a declaration of the official filing is made and the petition is given to the local Bureau official, that official shall immediately enter on the petition the date of receipt (this date becomes the date of official filing) and shall inform the spokesman for the petitioners that no additional signatures may be added and that no withdrawal of signatures will be permitted....

Section 82.8 establishes the petition filing deadline, not § 82.5.

Once the local Bureau official determined the cut-off date of December 31, 1998, the Secretary's rules prohibit the addition of any more names to the list of eligible voters. Based on the information which the local Bureau official had gathered to satisfy herself that she could make a determination, the local Bureau official determined that the number of eligible voters in District 1 was 518, in District 2 there were 47, and District 3 had 1,373. Under the Rules, the calculation of one-third of eligible voters in each of the three

---

**5.** The defendants argue in their summary judgment brief as follows:

> At the June 14, 2000 hearing, Plaintiff's counsel, Richard Monette, denied he was making as estoppel argument. Transcript at 32. However, the undersigned does not believe there is any other reasonable way to characterize the argument. It is noteworthy in this context that Plaintiff insists the

number of required signatures for each voting district set out in the Superintendent's November 24, 1998 should control, but not the *cut-off* date of December 31, 1998 agreed upon by Plaintiff and the Michigan Agency Superintendent, by which the Plaintiff had collected *no* signatures.

Defs.' Brief in Support of Mot. for Summ. J. at 22, n. 7 (emphasis in original).

Districts as required by Article VII of the Tribal Constitution must be made based on the local Bureau official's pre-cut-off-date determination. Otherwise, the cut-off date would have no significance, § 82.5(b) would be violated, and the uniform and orderly process for determining the numerical sufficiency of the petition would be sacrificed.

The defendants' argument concerning the determination of the required number of signatures reverberates with the cry that any confusion is the fault of the Tribal government, not the Agency. It is true that the Tribal Clerk furnished its information on the number of eligible voters to the local Bureau official in November 1998, and likewise furnished another set of lists of eligible voters in August 1999. To the extent that the number of eligible voters is different on each list, it is reasonable to infer that names were added to the August 1999 lists, that is, the lists were increased after the cut-off date, in violation of Rule 82.2(b). It is worth repeating, however, that although tribal input is required, the ultimate determination of the number of signatures necessary to comply with tribal constitutional provisions falls to the federal agency. Nothing in the rules prohibits the local Bureau official from making a probing inquiry and thorough examination of the information furnished by the Tribe before the local Bureau official reaches a final determination of the required number of signatures and the establishment of a cut-off date. In this case the local Bureau official expressed some concern about the accuracy of the data she was furnished, but it is appropriate to conclude that the local Bureau official's conclusion was based upon a reasonable degree of certainty. A more thorough, advance review of tribal information made before the cut-off date and prior to the gathering of signatures is a better guard against confusion and disorder than a *post hoc* reassessment of new information submitted by interested parties.

Nor can the August 1999 redetermination of the number of necessary signatures be properly characterized as a "reconsideration" after the fashion of the Secretary's reversal of the September 22, 1999 letter-decision dealt with earlier in this opinion. Rule 82.5(b) is designed to establish a benchmark and to prohibit such "reconsiderations" which result from belatedly adding additional names to the voter rolls. Furthermore, under the Court's analysis in *Belville Mining, supra,* the August 1999 recalculation of the number of votes cannot be considered timely. In that case, the Court identified several factors used to determine whether administrative reconsideration occurred within a "short and reasonable time:" (1) the express time limit for appeals set forth in the regulation; (2) whether legally cognizable property interests had arisen through the initial decision; (3) whether the plaintiff acted in reliance on the initial decision; (4) whether the agency had attempted to use the pretext of fraud to justify reconsideration; and (5) the probable impact of an erroneous agency decision absent reconsideration. *Belville,* 999 F.2d at 1001. Weighing these factors, it is readily apparent that changing the number of required signatures after the petitions have been submitted, especially in light of § 82.5(b), it is not a timely reconsideration.

The BIA determined in November 1998, based on the number of eligible voters over 18 years old, that the petitioners would be required to gather 173 valid signatures in District 1, 16 signatures in District 2, and 458 signatures in District 3. To use different numbers to determine the sufficiency of the petitions after the petitions were submitted was contrary to law and constituted an abuse of discretion on the part of the Agency.

### B.

The plaintiff also argues that the actions of the BIA in rejecting certain

signatures from the submitted petitions was "arbitrary and capricious." The plaintiff cites four examples. First, five members' signatures were rejected because the collector of the signatures failed to sign the petition form. Second, the signatures of Joanne Kulik and Florence Gravarette were rejected because they were not included on the tribal roll. Both Kulik and Gravarette died between December 31, 1998 and July 15, 1999. Third, the signatures of Rachel Bennett and Carla Jo Bennett were rejected because they were not included on the tribal roll. Fourth, the signature of Mr. Jackson was rejected on the petition because he signed "Tony" but on the tribal roll he was listed as "Anthony."

A petition must include (1) a "summary of the objectives of the petitioners," (2) the "date upon which the petition was signed by each individual," and (3) the "current mailing address of each signer." 25 C.F.R. § 82.6. Authorization of petition signatures can happen in one of two ways: (1) through having each signer subscribe or acknowledge his/her signature before a notary public; or (2) through having a collector of signatures appear before a notary and sign, in his/her presence, on each sheet of the petition, a statement attesting that the signatures were affixed on the dates shown and by the individuals whose names appear thereon, and that to the best of his/her knowledge the signatories are eligible, entitled, or qualified voters. 25 C.F.R. § 82.7.

The collector must be an eligible, entitled, or qualified voter. *Id.* The five members' signatures were rejected because they were not authorized pursuant to 25 C.F.R. § 82.6. Since the rejection was not "contrary to law," but in accordance with the law, this action by the BIA was not "arbitrary or capricious."

As to the rejection of signatures because they were not on the tribal roll, the list used by the BIA in determining enrollment was supplied by the Tribe itself on August 20, 1999, and was entitled "Enrolled Members in Districts as of December 31, 1998 Aged 18–120 Years." A.R. at 101–207. In a reorganized tribe, "only members who have duly registered shall be entitled to vote" in Secretarial elections. 25 C.F.R. § 81.6(b). The BIA states that it does not maintain any tribal membership records and relies on the Tribe for that information. The BIA used the August 20, 1999 tribal roll to determine member eligibility. The names mentioned by the plaintiff (Kulik, Gravarette, Rachel Bennett and Carla Jo Bennett) were not on the tribal roll and, thus, their signatures were rejected. Since the BIA provided a reasonable explanation, this decision was not "arbitrary or capricious."

As to Mr. Jackson, the BIA employee stated in her affidavit dated September 5, 2000, that because the address on the petition did not match the address on the tribal roll, the signature was rejected because she "could not reasonably conclude that the persons residing at these addresses were, in fact, the same person." Gillette affidavit ¶ 11. The plaintiff offers an affidavit dated January 26, 2001, by Mr. Jackson which purports to explain the discrepancy. However, as noted above, judicial review is generally confined to the administrative record on which the agency based its decision. *Sierra Club,* 120 F.3d at 638. Supplementation is appropriate when the agency "deliberately or negligently excludes certain documents" or when "background information" is needed by the Court. *Id.* Supplementation should not turn judicial review into a trial *de novo. United States v. Akzo Coatings of Am., Inc.,* 949 F.2d 1409, 1428 (6th Cir. 1991). In the instant case, the information

purporting to explain the discrepancy between the addresses was not available to the BIA at the time and was not, therefore, used to make the decision. Because the regulations required the "current mailing address of the signer," and the addresses on the tribal roll and the petition for Mr. Jackson did not match, the decision to reject the signature has a "rational connection" to the facts. *GTE Midwest, Inc.*, 233 F.3d at 345. Therefore, this decision was not "arbitrary or capricious."

The final determination of the agency of the number of valid signatures for each voting District must, therefore, be sustained. Those numbers, once again, are 211 signatures in District 1, 20 signatures from District 2, and 549 from District 3.

## V.

It is apparent that the petitioners have gathered more than one-third of the eligible voters' signatures in each voting District. They were required to obtain 173 signatures in District 1 and they obtained 211; 16 signatures were required in District 2 and 20 were obtained; 458 signatures were required to be collected in District 3 and the petition submitted 549 valid signatures. The petitioners have submitted the necessary signatures to trigger the provision in Article VII of the Tribal Constitution requiring the Secretary to call an election. The determination that the petitions were numerically insufficient was contrary to law, arbitrary capricious and capricious, and constituted an abuse of discretion.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt # 23] is **DENIED** and the plaintiff's motion for summary judgment [dkt # 27] is **GRANTED.**

It is further **ORDERED** that the defendants shall proceed to call and hold a Secretarial election in accordance with 25 U.S.C. § 476(c)(1)(B) and 25 C.F.R. pts. 82 & 83 to determine if the constitution of the Saginaw Chippewa Indian Tribe of Michigan shall be amended.